**Affirmed and Opinion filed May 29, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00790-CR

**JASON ALEXANDER SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 240th District Court
Fort Bend County, Texas
Trial Court Cause No. 06-DCR-044730A**

## O P I N I O N

In six issues, appellant Jason Alexander Smith appeals his felony conviction for murder. Appellant complains (1) he was denied a speedy trial; (2) there was insufficient corroborating evidence to support accomplice testimony; (3) he was denied the right to confront and cross-examine the expert who performed DNA tests; (4) the trial court admitted hearsay testimony; (5) the trial court limited cross-examination of the accomplice witness; and (6) the jury charge allowed an

improper non-unanimous verdict.  We affirm.

## *Factual Background*

Appellant and Hiro Hariram met through a mutual friend.  They instantly struck up a friendship.  For a time, appellant lived in a garage apartment with Hariram and his girlfriend Yvette.  The apartment was attached to the home where Yvette's mother and Roberto Cabrera lived.  Hariram and Yvette subsequently married and moved into their own apartment, at which time appellant moved into another apartment.[1]

Cabrera told the police investigator that, while appellant lived in the garage apartment, someone had been going into Cabrera's bedroom while he was not there.  Cabrera suspected appellant was the culprit.  When appellant moved away, these occurrences stopped.  Cabrera owned a .357 magnum revolver with the initials M.J.W. on the handle that he kept in his unlocked nightstand.

Hariram testified at trial to the following events.  On August 8, 2003, Hariram returned home in a rental car from a business trip to Atlanta.  During the return drive, Hariram received two separate phone calls from appellant and the complainant, Daryl Hayes, regarding a marijuana drug deal they wanted to conduct.  Hariram had acted as the middleman for Hayes in several prior drug deals.  Hayes told Hariram he was not comfortable around appellant and wanted Hariram to be present for the transaction.  Hariram picked up appellant at his apartment and went to meet Hayes.  Appellant purchased one pound of marijuana from Hayes, and Hayes told appellant more marijuana was available to purchase.

Hariram and appellant thereafter went to Hariram's apartment.  Hariram and appellant took Yvette's yellow Nissan Xterra to meet Hayes and negotiate the

---

[1] Yvette changed her last name when she married Hariram.  We refer to her as Yvette for clarity.

2

purchase of the additional marijuana. Once a deal was reached, appellant left in the Xterra, purportedly to deliver to his buyer the one pound of previously-purchased marijuana. The Xterra keychain included a key to Cabrera's home. Approximately twenty minutes later, appellant called Hariram and asked Hariram and Hayes to meet him at Cabrera's home.

Hariram and Hayes subsequently picked up appellant at Cabrera's home in Hayes's black Mitsubishi. They had placed the remaining marijuana in a duffle bag in the trunk of the car. They then left in the Mitsubishi to meet appellant's buyer. Appellant was in the backseat behind Hayes, who was driving. Hariram was in the passenger seat. Only appellant knew where they were supposed to be going and provided the directions. On the way, an argument arose between appellant and Hayes. Appellant allegedly was angry that Hayes required Hariram to be present during their drug transactions. A gun then discharged, the car picked up speed, and Hayes slumped over the steering wheel. Hariram attempted to gain control of the car, which hit a fence behind a house and came to rest against a telephone pole.

A neighbor testified she was in her home and heard the collision. She looked out the window and saw a hubcap roll into her yard. She went outside, saw a man in an orange shirt across the street, and heard him yelling to call 911. She went back inside and did so. She then went back outside and saw a second man "wearing a white T-shirt, jeans, and a blue cap backwards on his head." One of the men grabbed something out of the trunk, and they both "took off running down the street." Hariram and Yvette both testified that Hariram had been wearing an orange shirt that day, and Hariram testified that appellant was wearing a blue bandana and a light "grayish" t-shirt.

After the car crashed, Hariram saw appellant place a gun with a brown and

3

chrome handle in his waistband. Hariram also noticed appellant had retrieved the duffle bag from the trunk. Forgetting the Xterra keys, Hariram fled on foot with appellant to appellant's apartment. When Hariram asked appellant why he shot Hayes, appellant allegedly responded, "[H]e was talking shit," and appellant "had to put God in his life." Hariram then called Yvette, who picked him up, and they went to a hotel where Hariram called an attorney.

Hariram and his attorney contacted the police, and Hariram led police to appellant's apartment, where they recovered, among other things, six shell casings from a .357 magnum revolver hidden in a shoe. Hariram also led police to the location of the revolver allegedly used in the crime. According to Hariram, the evening of the murder, he received a phone call from a friend who said appellant had given him the revolver. Hariram retrieved the revolver and gave it to his brother for safekeeping in the brother's apartment, where police recovered it. Police later determined through ballistics testing that five of the six shell casings found in appellant's apartment were fired from the revolver.[2]

Appellant fled to Kansas after the murder. His apartment was vacant when police searched it, and appellant never returned to his job in Houston after the murder. Almost two years after the murder, appellant was arrested in Kansas and thereafter extradited to Texas. Subsequently, a Fort Bend County Sheriff's deputy conducted a human-scent lineup with three bloodhounds. Officers had collected scent samples implicating appellant from various locations and items inside Hayes's car, a white t-shirt found on or near the trunk of the vehicle, and the revolver.

---

[2] The test results as to the sixth shell casing were inconclusive.

## *Procedural History*

Appellant was released on bond, and nine months later, a grand jury indicted him for murder.[3] He filed a pre-trial motion for discovery, production, and a *Kelly*[4] hearing on the scent-lineup evidence. After a hearing, the trial court denied the motion to suppress the scent-lineup evidence. Appellant thereafter filed a motion to exclude all testimony and evidence in connection with the scent lineup, which the trial court denied at another hearing. The trial court subsequently held a non-evidentiary hearing on appellant's motion to reconsider the ruling on the scent-lineup evidence. The trial court orally granted the motion for reconsideration and ruled the scent-lineup evidence would be excluded, setting aside the previous ruling. The State filed its first motion for continuance on the same day for want of a witness. The trial court granted the continuance.

The State filed its second motion for continuance five days after the trial court signed the order to exclude the scent-lineup evidence. The State sought that continuance because its motion to reconsider the ruling on the scent-lineup evidence had not yet been heard by the trial court. The trial court granted the motion for continuance but denied the motion for reconsideration. The State appealed the denial of the motion for reconsideration. This court affirmed, and mandate issued on November 21, 2011. *See State v. Smith*, 335 S.W.3d 706 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

Appellant's jury trial commenced eight months later.[5] At trial, the State

---

[3] Hariram also was indicted on murder charges for the same crime.

[4] *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

[5] Before the case went to trial, appellant had agreed to at least 33 resets of preliminary hearings and trial.

introduced testimony regarding test results of DNA obtained from certain items.[6] The analyst who performed the DNA testing did not testify at trial. Instead, the laboratory director testified. The forensic report was not offered or admitted into evidence. Appellant objected to the testimony on the basis that it would violate his Sixth Amendment right to confront and cross-examine the analyst who performed the tests and prepared the results. The trial court overruled the objection.

A jury found appellant guilty of murder as charged in the re-indictment of April 2, 2012, and the trial court sentenced appellant to sixty years' imprisonment, in accordance with the jury's verdict.

## *Discussion*

### I.      No Violation of Right to Speedy Trial

In his first issue, appellant contends that he was deprived of his right to a speedy trial because his case was tried more than seven years after he was arrested. The right of an accused to a speedy trial is guaranteed through the Sixth Amendment to the United States Constitution. *Zamorano v. State*, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002). In addition, Article I, section 10 of the Texas Constitution guarantees the accused in all criminal prosecutions the right to a speedy and public trial. *Id.*

We analyze a speedy trial claim on an ad hoc basis by applying a fact-specific balancing test under *Barker v. Wingo* of the following four factors: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice inflicted on the defendant by the delay. 407 U.S. 514, 530 (1972); *Henson v. State*, 407 S.W.3d 764, 767 (Tex. Crim. App. 2013).[7] No

---

[6] DNA from blood on the revolver and a t-shirt in the trunk of the Mitsubishi were tested and determined to match the complainant's DNA to a reasonable degree of scientific certainty.

[7] The Texas constitutional speedy trial right exists independently of the federal guarantee,

6

single factor is necessary or sufficient to establish a violation of the right to a speedy trial; instead, the court must weigh the conduct of the prosecution and defendant using a balancing test of the four factors. *Barker*, 407 U.S. at 530, 533; *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008).

The State must satisfy its burden of justifying the length of the delay while the defendant must meet his burden of proving the assertion of the right and showing prejudice. *Cantu*, 253 S.W.3d at 280. The reasons proffered by the State to justify any amount of delay serve to determine how heavily such delay should weigh against it. *Zamorano*, 84 S.W.3d at 649. "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Cantu*, 253 S.W.3d at 280. In other words, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280-81.

We apply a bifurcated standard of review to a trial court's ruling on a speedy trial claim. *Id.* at 282. We review the factual components for an abuse of discretion, while we review the legal components de novo. *Id.* Review of the individual *Barker* factors necessarily involves factual determinations and legal conclusions, but the balancing test as a whole is "a purely legal question." *Id.* With regard to the trial court's resolution of factual issues, we view all the evidence in the light most favorable to the trial court's ultimate ruling. *Id.* Because appellant lost in the trial court on his speedy trial claim and the trial court did not enter findings of fact or conclusions of law on this issue, we presume that the trial court resolved any disputed fact issues in the State's favor and defer to the

---

but we analyze claims of a denial of the state speedy trial right under the factors established in *Barker*. *Zamorano*, 84 S.W.3d at 648.

7

implied findings of fact supported by the record. *See id*.

### A. Length of the Delay

The *Barker* test is triggered by a delay unreasonable enough to be "presumptively prejudicial."[8]  *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.)  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.  *Id*. at 507 n.3 (citing *Barker*, 407 U.S. at 530); *see also Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).  A delay approaching one year from formal accusation or arrest of the defendant until trial has generally been found to be presumptively prejudicial, triggering the *Barker* inquiry. *Celestine*, 356 S.W.3d at 507 (citing *Cantu*, 253 S.W.3d at 281, and *Shaw*, 117 S.W.3d at 888–89).

The invocation of the right to a speedy trial requires either actual restraint by the State or formal accusation.  *Wells v. State*, 319 S.W.3d 82, 88 (Tex. App.—San Antonio 2010, pet. ref'd).  Appellant was arrested and taken into custody on June 28, 2005.[9]  Thus, for purposes of appellant's speedy trial claim, the relevant time period begins on that date.  *See id*.; *see also Zamorano*, 84 S.W.3d at 649 (considering four-year delay between arrest and plea hearing in reaching conclusion that delay was presumptively prejudicial).

Appellant's case was reset many times, each time by party agreement.[10]

---

[8] Appellant complains that more than nine years elapsed between the murder and appellant's trial.  However, it is undisputed that appellant was not arrested until nearly two years after the crime was committed.  Pre-accusation delay is not relevant to the speedy trial analysis. *United States v. Marion*, 404 U.S. 307, 313 (1971).

[9] Appellant was released on bond in October 2005.

[10] The record reflects 33 agreed reset forms were filed.  The State contends that three additional reset forms were filed, but they are not part of the appellate record.  Each reset form in the record includes the following information, "This case is reset to [date] at [time], by

Moreover, appellant did not assert his right to a speedy trial until April 24, 2012, which is the same day he agreed to the last reset. We exclude the time covered by agreed resets from the speedy trial calculation because agreed resets are "inconsistent with [the] assertion of a speedy trial right." *Celestine*, 356 S.W.3d at 507.[11] The agreed resets covered the time period from August 31, 2006 through the date of trial on July 17, 2012. Excluding that time from the speedy trial computation, however, still leaves a delay of over one year between the date of appellant's arrest on June 28, 2005 and the first agreed reset on August 31, 2006, which is presumptively prejudicial.[12] *See Cantu*, 253 S.W.3d at 281; *Celestine*, 356 S.W.3d at 507. Accordingly, we must analyze the other *Barker* factors. *See Celestine*, 356 S.W.3d at 507.

### B. Reason for the Delay

Once the length of time is found to be presumptively prejudicial, the burden of justifying the delay falls on the State. *Cantu*, 253 S.W.3d at 280. The particular reason for the delay will determine how heavily this factor should weigh against the State. *Zamorano*, 84 S.W.3d at 649. Prosecutorial delay determined to be intentional or deliberate will weigh heavily against the State. *Id*. (citing *Barker*, 407 U.S. at 531). Delays determined to be neutral in nature, such as for negligence

---

agreement of all the undersigned." Of the 33 reset forms in the record, all were signed by appellant's attorney, and all but one were signed by appellant. Several of the resets occurred during the pendency of the State's appeal of the trial court's order suppressing scent-lineup evidence. *See Smith*, 335 S.W.3d 706.

[11] Prior to deciding *Celestine*, we had held a defendant waives his right to speedy trial by agreeing to resets. *See Caicedo v. State*, 769 S.W.2d 597, 598 (Tex. App.—Houston [14th Dist.] 1989, no pet.). But both before and after we decided *Caicedo*, we had held that the time covered by a defendant's agreed resets is to be excluded from the speedy trial calculation. *See State v. Kuri*, 846 S.W.2d 459, 463 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd); *see also Lewis v. State*, 686 S.W.2d 243 (Tex. App.—Houston [14th Dist.] 1985), *aff'd*, 711 S.W.2d 41 (Tex. Crim. App. 1986).

[12] The State concedes that the length of the delay in this case is presumptively prejudicial.

or overcrowded courts, will weigh less heavily on the State. *Id.* Any delay that is determined to be valid should not weigh against the State at all. *See State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). When the State has not assigned a reason for the delay, we may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). The reason for the delay is a fact-specific inquiry and may not be readily apparent from the trial record. *Henson,* 407 S.W.3d at 769.

As set forth above, the relevant time period for the delay is from June 28, 2005 through the date of the first reset on August 31, 2006. *See id.* The record is silent as to any reason for this fourteen-month delay. Thus, this factor weighs against the State, albeit not heavily. *See Dragoo*, 96 S.W.3d at 314; *see also McIntosh v. State*, 307 S.W.3d 360, 368 (Tex. App.—San Antonio 2009, pet. ref'd); *Rodriquez v. State*, 227 S.W.3d 842, 844 (Tex. App.—Amarillo 2007, no pet.).

### C. Assertion of the Right

When and how a defendant asserts his right to a speedy trial is entitled to strong weight in determining whether the defendant is being deprived of the right. *Cantu,* 253 S.W.3d at 283. A defendant's failure to diligently seek a speedy trial can be an indication that he does not want one. *See id.* ("[T]he failure to diligently seek a speedy trial supports the hoary lawyer's adage, 'Never tried, never convicted.'"); *see also Shaw*, 117 S.W.3d at 890 ("[A] defendant's failure to make a timely demand for a speedy trial indicates strongly that he did not really want one and that he was not prejudiced by not having one."). Thus, a defendant's inaction weighs more heavily against finding a violation the longer the delay becomes. *Shaw*, 117 S.W.3d at 890.

10

Appellant first asserted his right to a speedy trial by filing a motion on April 24, 2012, over seven years after his arrest and nearly seven years after his initial indictment. Appellant asserts that he did not waive his demand for speedy trial through inaction because he "never sought to delay trial." Although appellant did not waive his right to a speedy trial, his actions are inconsistent with a demand for speedy trial. *See Henson*, 407 S.W.3d at 769; *Shaw*, 117 S.W.3d at 890. Besides waiting seven years to demand a speedy trial, appellant continually acquiesced in resetting his case for trial, the last time being on the same day he filed his speedy trial motion, which cuts against showing an assertion of the right. *See Henson*, 407 S.W.3d at 769.

Appellant contends, however, he asserted his speedy trial right in November 2009 by opposing the State's second of three motions for continuance and requesting immediate trial.[13] Simply announcing "ready" or requesting the trial be held that day is not a demand for a speedy trial because this merely shows a defendant is ready to go to trial. *Henson*, 407 S.W.3d at 769. A speedy trial demand must be unambiguous. *Id*. Appellant's opposition to the continuance, when considered alongside the resets agreed to by appellant, does not reflect "the actions of someone seeking to preserve and protect his right to a speedy trial."[14]

---

[13] Although the State's second motion for continuance filed October 28, 2009 and the trial court's order granting the continuance signed November 3, 2009 are in the record, appellant's opposition is not. However, we take judicial notice of the opposition that was part of the previous appeal before this court. *See Smith*, 335 S.W.3d 706; *see also Ex parte Joyner*, 367 S.W.3d 737 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("An appellate court may take judicial notice of its own records in a related proceeding involving the same or nearly the same parties."). Appellant also argues he sought dismissal of the case as an alternative to an immediate trial. Appellant did not request dismissal of the case in the opposition; rather, he asked the trial court to "strike the State's pleadings filed after the State's First Motion for Continuance." Even if he had, seeking a dismissal will generally weaken a speedy trial claim because it shows a desire to have no trial instead of a speedy one. *Cantu*, 253 S.W.3d at 283.

[14] Appellant agreed to resets before, after, and on the same day the trial court granted the continuance on November 3.

11

*See id.*

The trial began three months after appellant filed his motion. This factor weighs heavily against finding a speedy trial violation. *See Dragoo*, 96 S.W.3d at 315 ("In view of the lengthy delay here, in which appellant quietly acquiesced, this factor weighs very heavily against finding a violation of the speedy trial right."); *see also Kelly v. State*, 163 S.W.3d 722, 729 (Tex. Crim. App. 2005) (concluding factor weighed against appellant when assertion of right was tardy and trial occurred two months after).

### D. Prejudice Analysis

We assess prejudice in light of the interests that the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. *Zamorano*, 84 S.W.3d at 652. The defendant has the burden to make some showing of prejudice, although a showing of actual prejudice is not required. *Munoz*, 991 S.W.2d at 826; *State v. Smith*, 76 S.W.3d 541, 551 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). When the defendant makes a prima facie showing of prejudice, the burden shifts to the State to show that the defendant suffered "no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Munoz*, 991 S.W.2d at 826; *Smith*, 76 S.W.3d at 551.

**Pretrial incarceration.** In determining whether pretrial incarceration was oppressive, the dispositive consideration is the effect the incarceration has upon the defendant. *Munoz*, 991 S.W.2d at 828; *Webb v. State*, 36 S.W.3d 164, 174 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Incarceration affects a defendant's livelihood and family life and enforces idleness. *Barker*, 407 U.S. at 532; *Webb*, 36 S.W.3d at 174.

12

Appellant was incarcerated for four months before his release on bond for the remaining majority of seven years before trial. While any period of incarceration is not to be taken lightly as it imposes restraints on one's liberty, the speedy trial guarantee was designed to minimize the possibility of lengthy incarceration before trial. *Barker*, 407 U.S. at 532; *see also United States v. MacDonald*, 456 U.S. 1, 8 (1982). Incarceration can amount only to minimal prejudice when it is for a small period of time relative to a much longer time period awaiting trial. *Compare Barker*, 407 U.S. at 533-34 (spending ten months in jail awaiting trial during five-year delay between arrest and trial amounted to minimal prejudice against defendant) *with Munoz*, 991 S.W.2d at 828 (implicitly finding seventeen-month incarceration oppressive when it was for entire delay before trial).

While appellant spent four months in jail, he subsequently was able to find employment in Kansas, enroll in school, enter into a relationship, and have a daughter while awaiting trial. Our review of the record does not show that appellant's incarceration had much effect upon his ability to earn a livelihood or upon his family life over the duration of the delay between his arrest and trial.[15] *See Barker*, 407 U.S. at 532; *see also Webb*, 36 S.W.3d at 174. While appellant's pretrial incarceration is indicative of some prejudice, the prejudice is minimal. *See Barker*, 407 U.S. at 533-34. Accordingly, the interest in preventing oppressive pretrial incarceration is not strongly implicated under these circumstances.

**Anxiety and concern.** Appellant contends he suffered from "anxieties and concern as a result of his indictment." Evidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when

---

[15] Moreover, as discussed above, the vast majority of that time period was covered by agreed resets. As discussed below, appellant claims that he lost three jobs as a result of required court appearances. But this occurred during the timeframe he consistently agreed to resets.

it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation. *See Cantu*, 253 S.W.3d at 285-86. However, appellant presented evidence that he had to travel nine-to-ten hours each way to court every thirty-to-ninety days and lost three jobs due to these court appearances. Although evidence of costs and lost jobs related to court appearances support an inference of actual prejudice, *see Zamorano*, 84 S.W.3d at 654,[16] these things occurred during the time period appellant consistently agreed to reset his case for trial. *See Celestine*, 356 S.W.3d at 507 (excluding time covered by agreed resets from speedy trial analysis). Accordingly, appellant has not presented evidence supporting an inference that the interest in minimizing his anxiety and concern was implicated under these circumstances.

**Impairment, if any, of defense.** The last type of prejudice is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532; *Cantu*, 253 S.W.3d at 285. With regard to the ability to mount a defense, affirmative proof of particularized prejudice is not essential to a speedy trial claim because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Dragoo*, 96 S.W.3d at 315. However, the presumption of prejudice is extenuated by the defendant's acquiescence in the delay. *Id*.

Appellant complains that his defense was impaired because he could not cross-examine two witnesses who were unavailable and certain evidence was missing by the time of trial. Appellant, however, has not shown that these

---

[16] In *Zamorano*, appellant's testimony of direct economic costs, four years' of disruptions to his job, and weekly requirement to report to bonding company supported an inference of actual prejudice. 84 S.W.3d at 654; *see also State v. Burckhardt*, 952 S.W.2d 100, 104 (Tex. App.—San Antonio 1997, no pet.) (concluding disruptions to work and income stream were prejudicial).

14

witnesses and the missing evidence were not available during the relevant timeframe preceding the agreed resets. *See Clarke v. State*, 928 S.W.2d 709, 716 (Tex. App.—Fort Worth 1996, pet. ref'd) (noting defendant must show witnesses were unavailable to establish prejudice). In fact, appellant concedes that one of the witnesses was available to testify as late as 2009. Moreover, with regard to the missing evidence—two coolers and a digital scale allegedly taken from appellant's apartment, along with file notes from a State's witness, probation officer Amber Moody[17]—appellant has not shown how their absence prejudiced him. Appellant has not made a prima facie showing of prejudice by satisfying his burden to show that the missing witnesses and evidence were unavailable during the relevant timeframe or what the missing evidence would have established. Thus, no evidence supports an inference that his defense was impaired under these circumstances.

We conclude appellant suffered no serious prejudice resulting from the delay.

### E. Balancing the *Barker* Factors

While the first two factors—presumption of an unreasonable delay and the State's failure to explain the delay—support appellant's position, the last two do not. Appellant's tardy assertion of the right weighs heavily against him, and the fact that he suffered little or no serious prejudice does not support his position. We conclude that the weight of the four factors, balanced together, is against finding a violation of appellant's right to a speedy trial. *See Barker*, 407 U.S. at 534 (concluding defendant's right to speedy trial was not violated when he was not seriously prejudiced by five-year delay between arrest and trial and did not really

---

[17] Moody testified that she left her file notes in the possession of her former employer. Appellant did not attempt to subpoena the records.

want a speedy trial); *see also Dragoo*, 96 S.W.3d at 308 (holding defendant's right to speedy trial was not violated when he demonstrated no serious prejudice by three-and-one-half-year delay between arrest and trial and he waited until just before trial to assert his right to a speedy trial).

We overrule appellant's first issue.

## II.    Evidence to Corroborate Accomplice Testimony Sufficient

In his second issue, appellant complains of insufficient evidence to corroborate Hariram's testimony.  Hariram, as a person indicted for the same offense as appellant, is an accomplice as a matter of law.  *See Burns v. State*, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985); *Batts v. State*, 302 S.W.3d 419, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

A conviction obtained in reliance upon accomplice testimony must be supported by sufficient corroborating evidence tending to connect the defendant to the offense committed.  Tex. Code Crim. Proc. art. 38.14; *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007).  When reviewing the sufficiency of the evidence to corroborate accomplice testimony, we eliminate the accomplice testimony and then examine the remaining portions of the record to see if there is any evidence that tends to connect the defendant with the commission of the offense.  *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Lacaze v. State*, 346 S.W.3d 113, 117 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).  The corroborating evidence need not, standing alone, rise to the level of proof beyond a reasonable doubt.  *Malone*, 253 S.W.3d at 257; *Lacaze*, 346 S.W.3d at 117.  Instead, the evidence simply must link the defendant to the commission of the offense and show that rational jurors could conclude that the evidence sufficiently "tended to connect" the defendant to the offense.  *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Lacaze*, 346 S.W.3d at 117.

16

Accordingly, corroborative evidence need not be legally sufficient in itself to establish a defendant's guilt.[18]  *Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012).

Taken in isolation, suspicious circumstances such as the accused's presence at the scene of the crime, motive, or opportunity to commit the crime are not by themselves sufficient to corroborate the testimony of an accomplice witness.  *Yost v. State*, 222 S.W.3d 865, 872 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). But cumulative suspicious circumstances may tend to connect the accused to the charged offense, even if no circumstances are sufficient to do so individually. *Yost*, 222 S.W.3d at 872.  Viewed collectively, even otherwise insignificant incriminating circumstances may tend to connect a defendant to a crime he is accused of committing.  *Id*.  Therefore, we "consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).  We view the evidence in the light most favorable to the jury's verdict.  *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008); *Lacaze*, 346 S.W.3d at 117.

The State argues Hariram's testimony was corroborated sufficiently by appellant's flight, evidence connecting appellant to the murder weapon, and eye-witness testimony placing appellant with the accomplice.  We agree.

**Flight.**  While flight alone is not adequate corroboration of an accomplice witness's testimony, *McDuff v. State*, 943 S.W.2d 517, 523 (Tex. App.—Austin 1997, pet. ref'd), "[e]vidence of flight and guilty demeanor, coupled with other corroborating circumstances, may tend to connect a defendant with the crime,"

---

[18] Thus, we are not required to parse every element of the alleged offense, as appellant has done in his appellate brief.  *See Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007).

17

*Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997). As set forth above, appellant fled to Kansas after the shooting, where he remained for nearly two years before being apprehended. He never returned to his apartment in Texas to retrieve his personal belongings and did not return to work after the murder. Before he was arrested in Kansas in 2005, appellant presented a driver's license with a false identity to an officer and told another officer that he had been on the run for "a couple of years" and "I know I have drug-related charges in Texas, but I didn't know they were murder, because I didn't know the guy died." These statements, along with appellant's flight, tend to connect him to the offense. *See Hernandez*, 939 S.W.2d at 178; *see also Yost*, 222 S.W.3d at 875 ("Evidence of flight and using a false identity . . . each reflect an appellant's consciousness of guilt for the charged offense.").

**Connection to weapon.** Evidence also tends to connect appellant to the murder weapon. As stated above, Cabrera suspected that appellant previously had entered his bedroom and, shortly after the murder, Cabrera discovered his revolver, which he kept in his bedroom in an unlocked nightstand, was missing. Shell casings found hidden in appellant's apartment had been fired from Cabrera's revolver. Cabrera's revolver was introduced at trial as the murder weapon. Proof that connects an accused to a weapon used in an offense is proper corroborative evidence. *Cockrum v. State*, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988) (finding evidence that appellant was seen with a gun similar to the one used in the offense corroborated accomplice testimony); *see also Lacaze*, 346 S.W.3d at 117.

**In the company of accomplice at or near time of crime.** Yvette testified she picked up Hariram at appellant's apartment complex on the day of the murder. An eyewitness also testified that she saw a man in an orange shirt and a man in a

18

blue cap and white t-shirt flee after the car collided with the fence.[19] This tends to support Hariram's testimony that Hariram was wearing an orange shirt and appellant was wearing a blue bandana and a light "grayish" t-shirt. Evidence that the accused was in the company of the accomplice at or near the time or place of a crime—when coupled with evidence tending to connect the accused to the commission of the crime—properly corroborates accomplice testimony in support of a conviction. *Hernandez*, 939 S.W.2d at 178; *see also Nolley v. State*, 5 S.W.3d 850, 854 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

Viewing all of the foregoing evidence in the light most favorable to the jury's verdict, we conclude that a reasonable jury could have found that the non-accomplice evidence tends to connect appellant to the murder. We overrule appellant's second issue.

### III.     Admission of Expert Testimony Harmless If Erroneous

In his third issue, appellant argues the trial court erred in admitting testimony from a DNA laboratory supervisor, Dr. Rick Staub, as to DNA tests that Staub did not observe or conduct, in violation of appellant's Sixth Amendment right to confront the witness who conducted the DNA tests. The Confrontation Clause gives a criminal defendant the right to confront the witnesses against him. U.S. Const. amend. VI; *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). This means that testimonial evidence is inadmissible unless the witness appears at trial and is cross-examined or the witness is unavailable and the defense had an opportunity to cross-examine. *Burch*, 401 S.W.3d at 636; *Adkins v. State*,

---

[19] The witness testified that the man in the blue cap was Hispanic, but appellant is African American with a dark complexion. When there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we must defer to the factfinder's resolution of the evidence. *See Smith*, 332 S.W.3d at 442. We may not independently construe the non-accomplice evidence. *See id*.

418 S.W.3d 856, 861 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Staub's testimony was based on his review of test results conducted by another analyst, Dierdre Ward. Relying on *Burch*, appellant argues he should have had the opportunity to cross-examine Ward regarding whether the lab's policies and practices were followed when she conducted the DNA tests. *Burch* stands for two propositions. First, a forensic report that asserts a fact is testimonial. *Adkins*, 418 S.W.3d at 862. Second, to satisfy the Confrontation Clause, the analyst who tested the substance must be subjected to cross-examination or, if the analyst is unavailable, the defense must have had the opportunity to cross-examine her. *Id.* (citing *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011) and *Burch*, 401 S.W.3d at 634).

Here, the lab report prepared by Ward was not admitted into evidence.[20] In *Burch*, the Court of Criminal Appeals expressly declined to address whether a defendant's rights would be violated when surrogate expert testimony is admitted as to lab results but the forensic report is not admitted into evidence. 401 S.W.3d at 639. The court acknowledged that the Supreme Court addressed this issue in *Williams v. Illinois*, 132 S. Ct. 2221 (2012), but noted it was "a splintered decision in which only an outcome, and not an opinion, received a majority vote," which "made its full impact hard to discern." *Burch*, 401 S.W.3d at 638. As we similarly have noted, *Williams* "raises as many questions as it answers."[21] *Lee v. State*, 418

---

[20] A chart containing a summary of the test results was admitted at trial without objection as a demonstrative exhibit. The chart is not part of the appellate record.

[21] From the viewpoint of the *Williams* plurality, the defendant's rights were not violated when an expert for the prosecution, relying on a report generated by an independent lab, testified that semen samples belonged to the defendant. *Burch*, 401 S.W.3d at 638. The plurality reached the conclusion that the out-of-court statement (that the DNA profile came from semen within the victim) was not offered to prove the truth of the matter asserted but instead was offered to explain the basis of the witness's independent conclusion (that the profile matched the defendant's DNA). *Id.* at 638-39. Alternatively, the plurality concluded that the report was not

20

S.W.3d 892, 898 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). But we need not address whether *Williams* applies under these circumstances, because the admission of Staub's testimony, even if erroneous, was harmless.

A violation of a defendant's right to confrontation is subject to harmless error analysis. *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007); *Mason v. State*, 416 S.W.3d 720, 731 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Thus, even if the admission of the testimony were erroneous, we nevertheless will affirm the conviction if we determine beyond a reasonable doubt that the alleged error did not contribute to appellant's conviction. *Mason*, 416 S.W.3d at 731; *see also* Tex. R. App. P. 44.2(a).

In determining whether the admission of the statement was harmless beyond a reasonable doubt, we consider (1) the importance of the statement to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Mason*, 416 S.W.3d at 731. In addition to those factors, we also may consider the source and nature of the error, the extent of the State's emphasis on the evidence, and the relative weight the jury may have assigned to the evidence as compared with the balance of the remaining evidence relevant to the issue. *Scott v. State*, 227 S.W.3d 670, 690 (Tex.

---

testimonial because it was created before there was a specific suspect and thus was not inherently inculpatory or created for use against the defendant. *Id*. at 639.

The opinion stressed that it was not a departure from earlier cases such as *Bullcoming* because the actual report was not admitted into evidence. *Id*. In *Bullcoming*, the Supreme Court held that forensic reports including testimonial statements of the analysts who performed the tests could not be offered into evidence through the testimony of surrogate witnesses. 131 S. Ct. at 2710. Although the result in *Williams*—that the expert's testimony was admissible—"was endorsed by five votes," the plurality's analysis was rejected by five justices. *Lee v. State*, 418 S.W.3d 892, 898 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Williams*, 132 S. Ct. at 2265).

Crim. App. 2007); *Mason*, 416 S.W.3d at 731. Finally, we consider any other factor contained in the record that might shed light on the probable impact of the evidence on the minds of average jurors. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *Mason*, 416 S.W.3d at 731.

We are not simply to decide whether the jury verdict enjoyed evidentiary support. *See Scott*, 227 S.W.3d at 690; *Mason*, 416 S.W.3d at 731. Instead, the question is whether the alleged constitutional error was actually a contributing factor in the jury's deliberations in arriving at a verdict. *Scott*, 227 S.W.3d at 690; *Mason*, 416 S.W.3d at 731. Thus, Confrontation Clause error does not require reversal unless there is a reasonable possibility that, within the context of the entire trial, the perceived error "moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Scott*, 227 S.W.3d at 690; *Mason*, 416 S.W.3d at 731.

After reviewing these considerations, we are persuaded beyond a reasonable doubt that the jury would have found appellant guilty of murder even if the trial court had not admitted Staub's testimony. *See Clay*, 240 S.W.3d at 905; *see also Mason*, 416 S.W.3d at 731. Staub testified that the lab received and tested a bloodstain card,[22] allegedly from the victim, swabs from the ejector housing, trigger guard, and cylinders of the revolver allegedly used in the crime, a hair recovered from one of the revolver's cylinders, and a t-shirt found in the trunk of the victim's car. The DNA taken from the ejector housing, the trigger guard, and a bloodstained area of the t-shirt matched the victim's DNA to a reasonable degree of scientific certainty.[23] With regard to the samples from the revolver's cylinders,

---

[22] Labs maintain blood samples from individuals by placing blood on bloodstain cards and letting it dry.

[23] The nonstained area of the t-shirt was also tested to try to determine its wearer. Test results of the DNA taken from these areas were inconclusive, but the victim could not be ruled

the victim could not be excluded as a contributor to the DNA profile, and some results were present from another individual, but no match could be determined.

**Testimony somewhat important but not crucial to the State's case.** The State's case did not hinge on Staub's testimony. The testimony regarding the revolver was somewhat important to the State because it shows the revolver was used in the murder. However, the importance of that evidence is offset by other factors linking the weapon to the crime, as discussed below. It does not link appellant to the crime, however, while other evidence presented at trial does.

The fact that the victim's blood was on the t-shirt alone does not link appellant to the crime. During closing argument, State's counsel stated:

> [Hariram] tells you [appellant] went to the trunk. . . . Don't forget, too, that T-shirt that was hanging over the trunk. . . . . But, remember, that T-shirt has on it bloodstains that are Daryl Hayes'.

> So what makes the most sense there? Well, if you just shot somebody point-blank, you're probably going to have blood on your hand and you're going to have blood on the gun. So when you go to the trunk to get the—the drugs out, you may grab a T-shirt that's laying there, wipe your hand, and wipe the gun before putting it in your waistband. That makes the most sense. And it was [appellant] that was standing at the trunk, according to [Hariram].

Although Staub's testimony was somewhat important because it tends to show that the revolver was used in the murder and that the shooter handled the t-shirt, the testimony was not crucial to the State's case. During closing argument, the State emphasized, "The most crucial piece of evidence is . . . those casings . . . in [appellant's] apartment." The State presented ballistics evidence that five shell casings were fired from the revolver used in the murder. The casings were linked to appellant because they were found in a shoe in his apartment. The casings also

out as a DNA contributor.

23

were linked to the revolver, and the revolver was linked to the murder. Hariram testified appellant took the Xterra to Cabrera's home. Appellant had the key to Cabrera's home and thus had an opportunity to retrieve the revolver shortly before the murder, and it was missing from Cabrera's home after the murder.

**Corroborated by and cumulative of other evidence.** Other evidence besides the victim's DNA on the revolver shows it was the murder weapon, as set forth above. Cabrera's revolver had a brown handle with the initials M.J.W. carved into it. Hariram testified that after the shooting and collision, he saw appellant put a gun with a brown and chrome handle in his waistband. At trial, Hariram identified the revolver as being "consistent with [the revolver appellant] place[d] into his waistband that day." The revolver was admitted at trial, and it had the same initials on the handle.

Hariram further testified a friend called him on the evening of the murder. The friend "sounded irate" because appellant had asked for a favor and had given him "something that he wasn't comfortable with." Hariram retrieved "the item," which was a revolver. Hariram gave the revolver to his brother, who kept it in his apartment. Hariram subsequently told police officers where it was, and they recovered the revolver there. Thus, the victim's DNA on the revolver was cumulative of and corroborated by other evidence that the revolver was the murder weapon.

**Strength of the State's case without the statement.** The State's case was strong without Staub's testimony because, among other things, (1) shell casings from the revolver were found in appellant's apartment; (2) other evidence linked appellant to the revolver, as set forth above; (3) appellant fled the state immediately after the murder and was on the run for two years; (4) appellant made incriminating statements to the officer in Kansas after appellant was apprehended;

24

(5) Hariram testified appellant was the shooter; and (6) one of the men the eyewitness saw at the collision site was wearing clothes similar to the ones Hariram described appellant as wearing.

After considering all of the harmless error factors, we find no reasonable probability that the trial court's alleged Confrontation Clause error "moved the jury from a state of non-persuasion to one of persuasion" on the issue of appellant's guilt. *See Mason*, 416 S.W.3d at 732. We hold any error by the trial court in admitting the evidence was harmless.

## IV. Hearsay and Confrontation Clause Complaints Not Preserved for Review

In his fourth issue, appellant complains that the trial court abused its discretion in admitting the following testimony from Hariram regarding hearsay statements made to Hariram in a telephone conversation:

[State's counsel:]   What did [your friend] tell you?

[Hariram:]            [My friend] told me that he was given something—he had been called by [appellant] and asked to do something that he wasn't comfortable with. [My friend] was on probation at the time and wasn't comfortable being around—

[Defense counsel:] Judge, I'm going to object. The answer calls for a hearsay response on [his friend's] part . . . .

The trial court did not admit the above testimony, as appellant contends. To the contrary, the trial court sustained the hearsay objection, but appellant was required to request additional relief to preserve error. *See Unkart v. State*, 400 S.W.3d 94, 98–99 (Tex. Crim. App. 2013); *Martinez v. State*, 17 S.W.3d 677, 690 n.11 (Tex. Crim. App. 2000). The traditional method for seeking relief at trial for a complaint that must be preserved is to object, request an instruction to disregard,

25

and move for mistrial.[24]  *Unkart*, 400 S.W.3d at 99.  Because appellant did not seek an instruction to disregard the hearsay statements or move for a mistrial, he has not preserved his complaint for appellate review.

Appellant also asserts that the trial court violated his right to confront and cross-examine the declarant in violation of the Sixth Amendment.  Appellant challenged the admission of the evidence only as impermissible hearsay.  A hearsay objection does not preserve error on Confrontation Clause grounds.  *See Austin v. State*, 222 S.W.3d 801, 810 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).  Appellant failed to preserve this complaint for appellate review.  *See id.*

We overrule appellant's fourth issue.

## V.     Cross-Examination Not Unconstitutionally Limited

In his fifth issue, appellant complains that the trial court unconstitutionally limited his cross-examination of Hariram by excluding certain testimony regarding Hariram's felony convictions for possession of a controlled substance and theft. *See Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) ("The Constitutional right of confrontation is violated when appropriate cross-examination is limited.").  The Confrontation Clause guarantees a defendant the right to cross-examine witnesses.  *See* U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Carroll*, 916 S.W.2d at 496–97.  A defendant may cross-examine a witness on any subject "reasonably calculated to expose a motive, bias or interest for the witness to testify."  *Carroll*, 916 S.W.2d at 497.

The right of confrontation is not absolute, however.  It guarantees an opportunity for effective cross-examination, not cross-examination that is effective

---

[24] A party may skip the first two steps and request a mistrial, but he will be entitled to one only if a timely objection would not have prevented and an instruction to disregard would not have cured the harm flowing from the error.  *Unkart*, 400 S.W.3d at 99.

in whatever way and to whatever extent the defense might wish. *Van Arsdall*, 475 U.S. at 679. The trial court may limit the extent of cross-examination for the purpose of challenging credibility. *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1997); *see also Ho v. State*, 171 S.W.3d 295, 304 (Tex. App.— Houston [14th Dist.] 2005, pet. ref'd). The scope of cross-examination is left to the sound discretion of the trial court, and its decision is not subject to reversal absent a clear abuse of that discretion. *See Cantu*, 939 S.W.2d at 635; *Ho*, 171 S.W.3d at 304.

**Possession of a controlled substance.** Appellant argues the trial court erred in admitting only the judgment and sentence against Hariram, but not allowing appellant to question Hariram on "details of [his] underlying conviction" for possession of a controlled substance. At trial, Hariram testified that prior to the murder he had been convicted of two felonies, one for unlawful use of a motor vehicle and one for credit card abuse. Appellant's counsel offered evidence that before the murder Hariram had a third felony conviction for possession of a controlled substance. She informed the trial court that she was offering the evidence to correct "a false impression to the jury that . . . [Hariram] was convicted of only two felonies when, in fact, he was convicted of this felony as well." She also sought to introduce evidence that appellant had pleaded guilty and had been placed on probation for the crime and subsequently violated his probation. The trial court stated, "I will allow into evidence the judgment and sentence of the conviction only."

The trial court thus admitted evidence to rebut Hariram's testimony that he had only two felony convictions prior to the murder. Appellant did not show at trial and has not shown on appeal how the trial court's refusal to admit evidence of appellant's guilty plea and probation violation—in addition to the judgment and

27

sentence—were needed to correct the false impression left with the jury. Moreover, appellant provides no explanation of how these details regarding the conviction would be admissible. Under Rules of Evidence 608 and 609, the fact of a prior conviction is generally admissible to impeach a witness, but details of the conviction are generally inadmissible for purposes of impeachment. Tex. R. Evid. 608, 609; *see Jabari v. State*, 273 S.W.3d 745, 753 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

**Theft.** Appellant also argues that the trial court erred in "refus[ing] to allow the defense to go into Hariram's probation conditions and refus[ing] to admit defense exhibits [sic] 25" with regard to Hariram's theft conviction after the murder. Defense exhibit 25 included a copy of the indictment, judgment and sentence, and conditions of probation for the theft case. Appellant asserted at trial and now asserts on appeal that he should have been able to introduce these details to correct "the false impression this conviction was only a business deal gone bad and that he did not owe any restitution."

On cross-examination, Hariram admitted that he was convicted for theft, but stated, "That was a business deal gone bad" and "Now, no one's owed money."[25]

---

[25] The whole exchange follows:

| [Defense counsel:] | Now, the probation that you talked about—I think you've already testified that was for a theft case, correct? |
| [Hariram:] | That was a business deal gone bad. |
| [Defense counsel:] | And somebody owed money in that case? |
| [Hariram:] | It wasn't a matter of owing money. It was a contract that went bad. |
| [Defense counsel:] | Did someone owe money in that? |
| [Hariram:] | Yeah, someone owed money. Now no one's owed money. |
| [Defense counsel:] | The [C]ity of Brownsville? |
| [Hariram:] | No. They're not owed money anymore. |

28

Appellant's counsel made the following argument outside the presence of the jury:

> Hariram referred to the incident in Cameron County as a business deal, a contract deal, that went bad. This was, in fact, a felony theft case. He was indicted. He's on probation for it. Secondly . . . he said that he did not owe any money in regards to this deal. And according to the conditions of probation of April 2011, there['s] a $41,000 restitution that is owed from this incident.
>
> We think the credibility of this witness is vital to this case, Your Honor. We think, here again, there was left a false impression to the jury in regards to what this case is about . . . . We feel the fact that he's on probation gives an additional issue of whether he is currying to the [S]tate of Texas in regards to his testimony, whether he's more—or whether he's more vulnerable in his testimony. And we would like an opportunity, here again, to present a defense in this case.

State's counsel argued testimony regarding the details surrounding Hariram's probation was inadmissible, citing *Gonzales v. State*. 929 S.W.2d 546, 549 (Tex. App.—Austin 1996, pet. ref'd) ("Other than conviction of a crime, a witness's character for truthfulness may not be impeached by proof of specific instances of conduct."). The trial court stated, "if [Hariram] testified that nobody is owed any money, then I think that subjects him to cross-examination and impeachment on whether somebody is or is not owed money."

Hariram testified on voir dire that the City of Brownsville was noted as the complainant with regard to his theft conviction. However, Hariram testified he did not owe restitution to the city as a condition of his probation—rather, he owed restitution to an individual named Richard Hope in the amount of $42,000. The trial court ruled that appellant's counsel could "ask [Hariram] in front of the jury whether or not he continues to owe any money as a result of his business dealings . . . and to whom that is, Mr. Richard Hope, and what the dollar amount is, period." Hariram subsequently admitted on cross-examination that he owed

29

Richard Hope $42,000. Appellant's counsel had also asked Hariram, "The theft case that you're on probation for—would you agree with me that a person who steals is a thief?" to which Hariram replied, "That's correct." In addition, Hariram had agreed on direct examination that his theft conviction was for a felony.

The jury thus heard testimony to rebut Hariram's testimony that the theft conviction "was a business deal gone bad" and "no one's owed money." Again, appellant has not shown on this record how the additional information regarding appellant's theft conviction and probation conditions was necessary to correct any false impression left with the jury or why that information would be admissible. *See* Tex. R. Evid. 608, 609; *see also Jabari*, 273 S.W.3d at 753.

We conclude that appellant's confrontation rights were not violated, and the trial court did not abuse its discretion in limiting appellant's cross-examination of Hariram. We overrule appellant's fifth issue.

## VI. Unanimity Requirement Not Violated

In his sixth issue, appellant complains the guilt-innocence charge allowed for a non-unanimous verdict. The jury charge permitted conviction for any one of four theories of murder, and appellant contends no evidence supports the theory submitted for felony murder pursuant to a conspiracy to deliver marijuana, which, according to appellant, could result in a non-unanimous verdict.

"Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). While the jury must unanimously agree about the occurrence of a single criminal offense, it need not be unanimous about the specific manner or means of how that offense was committed. *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011); *Ngo*, 175 S.W.3d at 745–46. When an appellant's indictment does not allege different offenses but

30

only different ways of committing the same offense, the court properly furnishes the jury with a general verdict form. *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. 1982) (op. on reh'g). Further, the unanimity requirement is not violated by instructing the jury on alternative legal theories of committing the same offense. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). Alternative methods of committing the same offense are properly submitted to the jury in the disjunctive if the evidence is legally sufficient to support a finding of the offense under any of the theories submitted. *Wert v. State*, 383 S.W.3d 747, 755 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)).

The jury charge allowed the jury to find appellant "guilty of murder as charged in the indictment"[26] if it found beyond a reasonable doubt that appellant, among other things, "on or about August 8, 2003 in Fort Bend County, Texas": (1) "intentionally and knowingly cause[d] the death of . . . Daryl Hayes . . . by shooting him with a firearm"; (2) "intentionally and knowingly commit[ted] an act clearly dangerous to human life that cause[d] the death of . . . Daryl Hayes . . . by discharging a firearm in [his] direction"; (3) "commit[ted] or attempt[ed] to commit [the] felony [of] aggravated robbery [and] intentionally and knowingly commit[ted] an act clearly dangerous to human life that caused the death of . . . Daryl Hayes . . . by discharging a firearm in [his] direction"; or (4) "commit[ted] or attempt[ed] to commit [the] felony [of] conspiracy to deliver marijuana [and] intentionally and knowingly commit[ted] an act clearly dangerous to human life that caused the death of . . . Daryl Hayes . . . by discharging a firearm in [his] direction." The general verdict form submitted to the jury permitted a verdict of not guilty or guilty of murder as charged in the indictment.

---

[26] The indictment alleged appellant "intentionally and knowingly cause[d] the death of . . . Daryl Hayes . . . by shooting him with a firearm."

31

The Penal Code provides that one commits the offense of murder by (1) intentionally or knowingly causing the death of an individual, (2) intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes the death of an individual, or (3) in the course of committing or attempting to commit a felony other than manslaughter, or in immediate flight therefrom, committing or attempting to commit an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code § 19.02(b). Although the conduct is distinctly different, the three methods of committing murder set forth in the statute are different manners and means of committing the same offense, not distinct and separate offenses. *Gandy v. State*, 222 S.W.3d 525, 529 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Aguirre*, 732 S.W.2d at 325–26 (holding when indictment contained two paragraphs, the first alleging murder under § 19.02(b)(1) and the second alleging murder under § 19.02(b)(3), the allegations were merely two different manners and means of committing same offense)); *see also Young*, 341 S.W.3d at 423 (noting murder is a "result of conduct" offense "because it punishes the intentional killing of someone regardless of the specific manner . . . of causing the person's death").

Both the indictment and the jury charge indicate that the only offense involved in this case was murder by any of the three methods set forth in the Penal Code. *See* Penal Code § 19.02(b). The jury returned a unanimous verdict that appellant committed murder. The jury was not required to agree unanimously as to the manner and means by which appellant did so. *See Aguirre*, 732 S.W.2d at 326; *see also Young*, 341 S.W.3d at 427-28. We conclude that the trial court committed no error in the jury charge and the charge did not violate appellant's right to unanimity of the jury verdict. We overrule appellant's sixth issue.

We affirm the judgment of the trial court.


/s/     Martha Hill Jamison
Justice


Panel consists of Chief Justice Frost and Justices Jamison and Wise.
Publish — TEX. R. APP. P. 47.2(b).

33