**Motion for Rehearing Overruled; Opinion of July 20, 2017 Withdrawn; Reversed and Remanded; and Substitute Opinion Filed December 14, 2017.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-16-00242-CR
_____

**FREDDY GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 0482220**

## S U B S T I T U T E   O P I N I O N

We overrule the State's motion for rehearing, withdraw our opinion dated July 20, 2017, and issue the following substitute opinion. The disposition remains the same.

A jury convicted appellant Freddy Garcia of aggravated sexual assault of a child, and the trial court sentenced him to 45 years' confinement and a $10,000 fine.

*See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B) (Vernon Supp. 2016). In two issues, appellant contends that: (1) he was denied his right to a speedy trial; and (2) the trial court erred by failing to require the State to elect at the close of its case-in-chief which alleged incident of sexual assault it sought to submit to the jury. We conclude appellant's right to a speedy trial was not violated, largely because he acquiesced to the delay when he became a fugitive. However, we are not convinced beyond a reasonable doubt that the State's failure to elect which act it relied upon to pursue a conviction had no or but slight effect on the jury's verdict. Accordingly, we reverse the trial court's judgment and remand for a new trial.

## BACKGROUND

In 1986, complainant was 11 years old when she moved from Mexico to Houston to live with her mother, two half-brothers, and appellant, her step-father. Complainant often would be left alone with appellant in the evenings while her mother went to work. Over the course of the next year, appellant allegedly sexually assaulted complainant in a series of escalating incidents. Complainant testified at trial that on one occasion during that time period appellant forced complainant into their apartment bathroom and penetrated her vagina with his penis.

On August 16, 1987, complainant's mother left complainant with appellant while she went to run an errand. Complainant's mother returned home early and found appellant in complainant's bedroom with his pants down. Complainant's mother and appellant argued, and appellant left the apartment and did not return.

Appellant was arrested the next day and was indicted on August 28, 1987. The indictment alleged a single count of sexual assault — specifically, that appellant penetrated complainant's sexual organ with his own sexual organ on or about August 16, 1987.

2

Appellant was released on bond, but an arrest warrant was issued when he subsequently failed to appear in court. Appellant eluded authorities for 27 years until he was located in North Carolina and arrested on November 18, 2014. Appellant was extradited to Texas on January 19, 2015.

The case went to trial on February 5, 2016. A jury found appellant guilty of aggravated sexual assault of a child and the trial court sentenced him to 45 years' imprisonment and assessed a $10,000 fine. Appellant timely appealed.

## ANALYSIS

### I.    Speedy Trial

In his second issue, appellant contends that his right to a speedy trial was violated because he was not brought to trial until more than 28 years after he was indicted. Because this is a threshold issue that would serve as an absolute bar to prosecution, we address it first. *See Barker v. Wingo*, 407 U.S. 514, 522 (1972) (proper remedy for speedy trial violation is dismissal of indictment); *Shaw v. State*, 117 S.W.3d 883, 888 (Tex. Crim. App. 2003) (speedy trial violation results in dismissal of the prosecution with prejudice).

The Sixth Amendment to the United States Constitution guarantees the right of an accused to a speedy trial. U.S. CONST. amend. VI. In conducting a speedy trial analysis, a reviewing court looks to the four factors set out in *Barker*. The *Barker* test balances: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his or her right; and (4) prejudice to the defendant. *Id*. In conducting a speedy trial analysis, we review legal issues *de novo* and review the trial court's resolution of factual issues for an abuse of discretion. *See Kelly v. State*, 163 S.W.3d 722, 726 (Tex. Crim. App. 2005).

3

### A. The Length of the Delay

This first factor is a double inquiry. *See Doggett v. United States*, 505 U.S. 647, 651 (1992). A court first "must consider whether the delay is sufficiently long to even trigger a further analysis under the *Barker* factors, and if it is, then the court must consider to what extent it stretches beyond this triggering length." *Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017).

To initially trigger a speedy trial analysis, the defendant must show that the interval between accusation and trial crosses the threshold dividing ordinary delay from "presumptively prejudicial" delay. *Doggett*, 505 U.S. at 651-52. Presumptive prejudice in this context simply means that a delay is facially unreasonable enough to conduct a full inquiry into the remaining *Barker* factors. *Id.* at 652 n.1. There is no bright-line rule for determining when a delay violates the right to a speedy trial. *Hull v. State*, 699 S.W.2d 220, 221 (Tex. Crim. App. 1985) (en banc). Generally, courts find a delay approaching one year sufficient to trigger a full inquiry. *Doggett*, 505 U.S. at 652 n.1; *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003).

Once the defendant establishes a presumptively prejudicial delay, the reviewing court must then consider the extent to which the delay has stretched beyond the threshold. *See Doggett*, 505 U.S. at 652. This second inquiry is significant to the speedy trial analysis because the presumption that pretrial delay has prejudiced the defendant intensifies over time. *Id.*

In this case, more than 28 years elapsed between the time of appellant's indictment and trial. A delay of 28 years is sufficient to trigger a full *Barker* analysis. *See Dragoo*, 96 S.W.3d at 314. Given the length beyond the threshold, we conclude that this factor weighs against the State. *See Gonzales v. State*, 435 S.W.3d 801, 809 (Tex. Crim. App. 2014) (six-year delay weighed heavily against the State).

## B.    Reason for Delay

The State carries the burden of justifying its delay.  *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).  Valid reasons for delay do not weigh against the State, whereas bad-faith delays weigh heavily against the State.  *See Hopper v. State*, 495 S.W.3d 468, 474 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 520 S.W.3d 915 (Tex. Crim. App. 2017).

The delay here covers two distinct periods.  The first period runs from the time of appellant's indictment until the appellant's re-arrest and extradition to Texas — a span of roughly 27 years.  The second period runs from the time appellant came into the State's custody on January 19, 2015, until appellant's trial on February 5, 2016 — a span of approximately 13 months.

The State has valid reason for the first portion of the delay; appellant was a fugitive for nearly this entire period.  *See id.* at 475 (first period of delay, where "appellant was either on the run or facing trial in Nebraska," did not weigh against State); *Lott v. State*, 951 S.W.2d 489, 494 (Tex. App.—El Paso 1997, pet. ref'd) (a fugitive "undoubtedly bears at least some fault for the length of the delay").

Appellant nevertheless contends that this period of the delay should weigh against the State because the State was negligent in its attempts to locate appellant.  The evidence demonstrates otherwise.  Appellant used a different name and social security number on at least one occasion when he applied for a driver's license in Florida.  Investigators periodically searched for appellant, including checking his last known address on several occasions, searching national databases, placing wanted ads in newspapers, and featuring appellant on the Crime Stoppers website.  These efforts began in 1987 and continued until 2014 when an investigator with the Harris County District Attorney's Office located appellant living in North Carolina.  We conclude the State was diligent in attempting to locate appellant.  *See Lott*, 951

5

S.W.2d at 495 (State was diligent in attempting to locate appellant where search covered "many search avenues . . . over the course of thirty years and four investigations," despite lengthy gaps between search efforts). Consequently, the reason for this part of the overall delay does not weigh against the State. *See id.* (where appellant contended that State should have located him when he received services at a veterans' hospital, court concluded that "the State's failure to continue with an active investigation which might have detected that Lott had 'surfaced' under his own name in order to receive veterans' benefits in 1986 stemmed not from a lack of diligence, but from Lott's own crafty, and successful, twenty-year-old disappearing act").

Regarding the second part of the delay, spanning the period after his re-arrest but before trial, the record shows that appellant agreed to six trial resets and at one point requested a trial continuance, which was granted. Appellant therefore is partially responsible for the second period of delay between his re-arrest and trial, and this factor weighs neither for nor against the State.

## C.     Assertion of Right to Speedy Trial

The right to a speedy trial is unlike other rights enshrined in the Constitution because the deprivation of the right, in some instances, may actually work to the defendant's advantage. *See Barker*, 407 U.S. at 521. As the pretrial delay increases, witnesses can die, their memories can fade, or they can become unavailable for any number of other reasons. *See Hopper*, 495 S.W.3d at 476. If these witnesses supported the State's theory of the case, then the prosecution will be impaired, and that impairment will work to the benefit of the defendant because the State carries the burden of proof. *Id.* For that reason, the Supreme Court has recognized that "[d]elay is not an uncommon defense tactic." *Barker*, 407 U.S. at 521.

Of course, delay also can prejudice the defendant, because with the passage of time grows the possibility that the defense may lose an alibi witness or access to other evidence with exculpatory value. *Id.* at 532. The more seriously that a defendant perceives a loss of this sort, the more likely he is to complain; accordingly, the defendant bears "some responsibility to assert a speedy trial claim." *Id.* at 529.

The record shows that appellant sat on his rights for more than 27 years before asserting his right to a speedy trial. The record also shows that for most of that time appellant was a fugitive. Appellant fled after being released on bond, indicating that he was on notice as to the charge against him. His flight evidences a lack of desire for any trial, much less a speedy one. *See Hopper*, 520 S.W.3d at 928 ("Because we have determined that the record supports a conclusion that appellant knew about his Texas charge, his complete failure to assert his right to a speedy trial for more than eighteen years suggests that he did not really want a speedy trial."); *Lott*, 951 S.W.2d at 495 (factor weighed against appellant when the evidence "support[ed] a finding that Lott, knowing of the charges, chose to remain at large for more than thirty years without ever demanding a trial.").

Further, appellant did not adequately assert his rights following his ultimate re-arrest. Appellant agreed to three resets between January 19 and August 31, 2015, at which time he filed a motion to dismiss for a speedy trial violation. Following this objection (to which it does not appear appellant secured a ruling), appellant agreed to three more resets and on one occasion requested a continuance. This court previously has held that "[w]e exclude the time covered by agreed resets from the speedy trial calculation because agreed resets are 'inconsistent with [the] assertion of a speedy trial right.'" *Smith v. State*, 436 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (quoting *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.)).

Consequently, this factor weighs heavily against appellant.

**D.     Prejudice to Appellant**

We review this final factor in light of the interests that the right to a speedy trial was designed to protect. *See Barker*, 407 U.S. at 532. The Supreme Court has identified three such interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize the defendant's anxiety and concern; and (3) to limit the possibility that the defense will be impaired. *Id.* Of these, the last is the most serious because the inability of a defendant to adequately prepare his case skews the fairness of the entire justice system. *Id.*

Appellant was not imprisoned during the 27 years he was a fugitive, and was tried within six months of requesting a speedy trial. Therefore, there was no risk of oppressive pretrial incarceration. *See Lott*, 951 S.W.2d at 496 ("Finally, Lott was not incarcerated for the thirty-year period between the original indictment and the final resolution of this case. Lott's case was finally disposed of within eight months after his first, and only, demand for a speedy trial.").

Appellant makes no claim of suffering any anxiety or concern. Regardless, any anxiety or concern suffered during his flight from justice was self-imposed. Accordingly, the second interest is not relevant here.

Appellant largely focuses on the third interest. Appellant first contends that we should presume prejudice resulted from the "excessive delay." *See Doggett*, 505 U.S. at 655. Such a presumption may be tempered, however, by extenuating circumstances, including a defendant's acquiescence in the delay. *See, e.g.*, *Hopper*, 520 S.W.3d at 928; *Dragoo*, 96 S.W.3d at 315.

As we explained above, the third factor does not favor appellant and supports a finding that appellant acquiesced in the delay. Appellant was aware that a charge

8

was pending against him and yet sat on his rights for more than 27 years despite having the opportunity to resolve that charge by returning to Texas and demanding a trial. We conclude that, even if we applied a presumption of prejudice in this case, the presumption is rebutted because appellant acquiesced in the delay. *See Hopper*, 520 S.W.3d at 929 ("Any presumptive prejudice due to the passage of time was extenuated by appellant's acquiescence in the delay and even further extenuated by appellant's failure to employ a remedy that would have guaranteed him a speedy trial.").

Appellant further contends he was actually prejudiced. Appellant relies primarily on the State's destruction of physical evidence in 1998 — specifically, the destruction of physical evidence that reflected the presence of semen on a vaginal smear collected from complainant. Appellant argues this destruction prejudiced his defense because DNA testing of the evidence may have exonerated him.

Appellant's argument is speculative. The destroyed evidence could have been either incriminating or exculpatory and, "[w]ithout knowing the quality of evidence, appellant can only speculate that the loss has impaired his defense." *See Hopper*, 495 S.W.3d at 479. Moreover, appellant used the lack of DNA evidence to cast doubt on the State's case. Appellant further argued that the State acted in bad faith when it destroyed the evidence and a spoliation instruction was included in the jury charge that permitted the jury to infer that the destroyed evidence was beneficial to appellant.

The delay also may have worked in appellant's favor. Complainant's mother died in the interim between appellant's indictment and trial. The testimony of complainant's mother — who walked in on appellant and complainant on August 16, 1987, and thereafter called the police on appellant — may have been more

9

damaging to the defense than the testimony of complainant, who was 12 at the time of the incident.

We conclude that this final factor does not weigh in appellant's favor. It is unclear whether appellant suffered actual prejudice, and it appears appellant received some benefit from the delay.

### E. The Balancing Test

Having addressed the four *Barker* factors, we must now balance them. *See Barker*, 407 U.S. at 533. "[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu*, 253 S.W.3d at 281. No single factor is either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial. *Barker*, 407 U.S. at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

The only factor weighing in favor of a violation of appellant's speedy trial right is the first factor: that the delay was excessive. Weighing against a violation are the second and third factors: that appellant was primarily responsible for the delay, and that appellant did not assert his right to a speedy trial for more than 27 years while avoiding arrest, and then for seven months after his arrest. The fourth factor — prejudice resulting from the delay — weighs neither for nor against appellant.

Any prejudice appellant suffered as a result of the delay is attenuated by his acquiescence to the delay. Appellant knew that he was indicted and took special precautions not to be found by law enforcement, including changing his name and social security number. Appellant is responsible for more than 27 years of the

10

approximately 28-year-delay, and appellant agreed to trial continuances covering the majority of the remainder. Accordingly, it does not appear that appellant truly desired a speedy trial. *See Hopper*, 495 S.W.3d at 481. Consequently, after balancing the four factors, we find no violation of appellant's right to a speedy trial. We overrule appellant's speedy trial issue.

## II. State's Election

In his other issue, appellant contends that the trial court erred by failing to require the State to elect at the close of its case-in-chief under which incident it sought to convict.

### A. When an Election is Required

The long-standing general rule is that the State must elect the act that it will rely upon for conviction when an indictment alleges one sexual assault but more than one sexual assault is shown by the evidence at trial. *See O'Neal v. State*, 746 S.W.2d 769, 771 (Tex. Crim. App. 1988) (en banc). If a defendant timely requests an election under such circumstances, the trial court must order the State to make its election at the close of the State's case-in-chief. *Id.* at 772. The trial court's failure to do so is constitutional error, and we must reverse unless we determine that the error was harmless beyond a reasonable doubt. *Phillips v. State*, 193 S.W.3d 904, 913-14 (Tex. Crim. App. 2006).

Requiring the election forces the State to formally differentiate the specific evidence upon which it relies as proof of the charged offense from evidence of other offenses or misconduct it offers only in another evidentiary capacity. *Id.* at 910. This allows the trial court to give clearer instruction to the jury on the proper use and weight to accord each type of evidence. *See id.* Further, the lack of such an election

implicates fundamental constitutional principles, *viz*: due process and due course of law. *Id.* at 913.

## B. Was an Election Required Here?

The State argues that no election was required because only one act of the kind alleged in the indictment was shown by the evidence. The indictment alleged a single instance of sexual assault involving penetration of complainant's vagina by appellant's penis.

Complainant testified regarding an incident that occurred in the bathroom at the second of three apartments in which she lived with her mother and appellant. Complainant testified that appellant called her into the bathroom, made her take off her clothes, put his penis in her vagina, and raped her. Complainant did not specify a date for this incident, but believed she was 11 at the time.[1]

The State does not dispute that this constitutes evidence of a penetration as alleged in the indictment. The State does dispute that any evidence was presented of a second penetrative assault like that alleged in the indictment. Appellant contends that at least some evidence was presented from which the jury could have determined that a second penetrative assault occurred on August 16, 1987, in complainant's bedroom.

Regarding the August 16 incident, complainant testified that her mother left to run an errand and that appellant followed complainant into her bedroom and pulled his pants down. Complainant provided conflicting testimony regarding whether appellant was able to remove her clothes before her mother returned. She first testified that

---

[1] Complainant testified that other non-penetration assaults continued to occur after this assault, thereby establishing that this assault was not the assault that took place on August 16, 1987. Likewise, the August 16, 1987 bedroom incident took place in the third apartment the family lived at, and when complainant was 12.

appellant did take her clothes off, but later could not remember whether appellant was able to take off her pants and underwear. The following exchange took place regarding whether penetration occurred on August 16:

> [STATE:] Where was [appellant's penis] — where was it in relation to you?
>
> [COMPLAINANT:] What do you mean?
>
> [STATE:] I'm not asking that good. Was he touching you with his penis at the time?
>
> [COMPLAINANT:] I mean, he was forcing me in that moment to try to take off my clothes.
>
> [STATE:] Okay. Was his —
>
> [COMPLAINANT:] Because I was refusing not to do what he wanted me to do. He's like no, forcing me on top of me and try to take off my pants and my underwear.

The State did not follow up and clarify regarding whether penetration occurred.

Other evidence suggested that penetration did occur during the August 16, 1987 bedroom incident. At trial, the police officer with the juvenile crimes division who interviewed complainant in 1987 testified that complainant told her that complainant was penetrated on August 16. The officer first testified that she remembered complainant telling her that appellant "got on top of [complainant]" and "put his penis in her vagina" on August 16. She later testified that, "[o]n the 16th, I don't know if she was penetrated, but other days she said she was." Finally, she testified on redirect (after reviewing her offense report) that, on the day complainant's mother caught appellant, complainant "said that [appellant] put his penis in her vagina a little because her mother got there."

Likewise, a report prepared by the Houston Police Department's Crime Laboratory indicated that there was semen present in a vaginal smear taken from complainant during a sexual assault exam performed on August 17, 1987. As discussed

previously, the semen was never DNA tested and the evidence was subsequently destroyed, but the jury could have believed this to be some evidence that a penetration occurred during the August 16, 1987 bedroom incident. No evidence was presented that complainant — who was 12 years old at the time — was sexually active with any other individual; the jury therefore may have believed that the semen was appellant's.

Several times during witness testimony and again at the close of the State's case-in-chief, defense counsel objected and requested that the State elect on which act it would proceed for conviction. The trial court denied the request, incorrectly concluding that the State was not required to elect until the close of all evidence. We conclude that at least some evidence was presented of a second assault conforming with the indicted offense. Accordingly, the State was required to elect upon appellant's timely request. The trial court's failure to require the State to elect at the close of its case-in-chief was error.

We determine next whether the failure to require a timely election was harmful.

### C.  Harm Analysis

Having concluded that the failure to require an election at the close of the State's case-in-chief constituted error, we must reverse the conviction unless we find beyond a reasonable doubt that the error did not contribute to the conviction or had but slight effect. *See Phillips*, 193 S.W.3d at 912-14 (citing Tex. R. App. P. 44.2(a)).

In determining whether the failure to require a timely election was harmful, we consider the four purposes behind the election rule:

(1) to protect the accused from the introduction of extraneous offenses;

(2) to minimize the risk that the jury might choose to convict not because one or more crimes were proved beyond a reasonable doubt,

14

but because all of them together convinced the jury the defendant was guilty;

(3) to ensure a unanimous verdict as to one specific incident which constituted the offense charged in the indictment; and

(4) to give the defendant notice of the particular offense the State intends to rely upon for prosecution and afford the defendant an opportunity to defend.

*Dixon v. State*, 201 S.W.3d 731, 733 (Tex. Crim. App. 2006).

### 1. Extraneous offenses

With regard to the first *Dixon* factor — protecting the accused from the introduction of extraneous offenses — Article 38.37 of the Texas Code of Criminal Procedure permits the admission of evidence of relevant extraneous offenses committed by a defendant against a child victim. *See* Tex. Code Crim. Proc. Ann. art. 38.37 (Vernon Supp. 2016); *Dixon*, 201 S.W.3d at 734; *Phillips*, 193 S.W.3d at 911. Accordingly, the first purpose does not weigh in favor of reversal.

Although evidence of extraneous offenses may be admissible, their admissibility "does not restrict a defendant's right to have the State elect the incident for which it will seek a conviction . . . ." *See Phillips*, 193 S.W.3d at 911. Here, appellant objected to the State's presentation of evidence concerning extraneous sexual offenses and requested that the State be required to elect whether it sought to convict as to each of those offenses. The trial court did not require an election on any of the other non-penetrative offenses.

### 2. Combination of incidents and unanimity

We conclude that the second and third *Dixon* factors weigh in favor of reversal.

There was at least some evidence of two separate penetrative sexual assaults: (1) the bathroom incident; and (2) the August 16, 1987 bedroom incident. That

15

evidence was presented from different sources, increasing the likelihood that the jury added up different events and testimony from different witnesses in rendering its verdict.

Additional circumstances in this case further increase the likelihood that the failure to require an election at the close of the State's case-in-chief thwarted the purposes underlying the second and third *Dixon* factors.

The jury charge in this case appeared to present only one incident as a basis for conviction, but the charge referenced a single penetrative assault that occurred (1) in a bathroom; ***and*** (2) on or about August 16, 1987. This record demonstrates that the earlier penetrative assault in the bathroom of the family's apartment when the complainant was 11 is a separate incident distinct from the later penetrative assault in the bedroom of a different apartment on August 16, 1987, when the complainant was 12.

The trial court charged the jury with an instruction that conflated the earlier bathroom incident and the separate August 16, 1987 bedroom incident:

> Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about the 16th day of August, 1987, in Harris County, Texas, the defendant, Freddy Garcia, did then and there intentionally or knowingly cause the penetration of the female sexual organ of [complainant], a person younger than fourteen years of age and not his spouse, by placing his sexual organ in the female sexual organ of [complainant], while inside a bathroom inside an apartment [complainant] shared with her mother, brothers, and the defendant, then you will find the defendant guilty of aggravated sexual assault of a child, as charged in the indictment.

The charge also instructed the jury that the State is not bound by the specific date on which the offense is alleged in the indictment to have been committed.

16

The State argued in closing that appellant "took [complainant's] virginity away in a bathroom while her mom was at work," but also argued that the semen collected from the August 16, 1987 bedroom incident was helpful to the State because there was "no other evidence of anyone [else] in that girl's life," suggesting that the semen was appellant's. The defense highlighted the ambiguity of the charge in closing:

> So, now you're given a jury instruction talking about what they have to prove to you. So, all of the evidence that was presented to you had to do with events that happened on August 16th of 1987. But then they change gears and now they're trying to say that there was something that happened in a bathroom in some part some apartment [sic] — and this is language that you're going to read — some bathroom, some apartment. How in a small apartment with two bedrooms that — I mean, where is the evidence here? How do we even know what apartment complex, what date it happened on?

Here, the jury charge and closing arguments conflated two incidents; but even if the jury charge had unambiguously presented only one incident for the jury's consideration, a proper jury charge cannot take the place of a timely election. *See Phillips*, 193 S.W.3d at 912.

Because some evidence was presented that penetration may have occurred both in a bathroom and separately on August 16, 1987, in complainant's bedroom, there is a significantly increased possibility that (1) the jury convicted based on a combination of the offenses without believing that the State proved one of those offenses beyond a reasonable doubt; or (2) some members of the jury convicted based on the bathroom incident and others based on the August 16, 1987 bedroom incident. *See Phillips v. State*, 130 S.W.3d 343, 353 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006) (finding constitutional error where "both offenses were described in detail more than once . . . yet, it was completely unclear to the jury which act the State would rely upon for conviction").

17

This significant possibility is made more likely because the jury charge — and the parties' closing arguments based on that charge — conflated these two separate incidents of penetrative assault.

### 3. Notice

We conclude that the fourth *Dixon* factor — providing notice to the defense of the particular offense the State intends to rely upon to convict and to afford the defendant an opportunity to defend — also weighs in favor of reversal. Because evidence of two assaults was presented, appellant had to defend against both assaults. The evidence presented concerned two discrete instances of penetration, and it was unclear in the absence of an election at the close of the State's case which incident the State would rely upon for a conviction, especially in light of the ambiguous jury charge and closing arguments.

We note that this fourth factor does not weigh heavily in favor of reversal because no evidence was presented at trial that appellant had a different defense to the separate alleged offenses. Appellant's defense across the board was that no sexual assaults ever occurred and that complainant fabricated the offense to get him out of her home because he was strict with her. His defense throughout trial also emphasized the lack of scientific evidence, missing evidence, and poor police investigation. It is unlikely that the jury's belief of appellant's defense that no sexual assault occurred at any time hinged on whether the State elected to designate one instance of sexual assault for its case-in-chief or another. *Cf. Taylor v. State*, 332 S.W.3d 483, 493 (Tex. Crim. App. 2011) (where the defensive theory was that no sexual abuse occurred at any time, egregious harm did not result from jury charge error because the jury either believed the appellant or the victim).

Because of the State's failure to elect which act it was relying upon for a conviction, it is possible that the jury convicted appellant by combining the

18

bathroom incident and the August 16, 1987 bedroom incident to overcome reasonable doubt. Likewise, it is possible that some members of the jury convicted based on the bathroom incident, and others convicted based on the August 16, 1987 bedroom incident. Further, as a result of the State's failure to make an election appellant did not have adequate notice of which act the State would rely upon in time to present his defense, and was therefore required to defend against both potential offenses. This last violation is somewhat moderated by appellant's outright denial of any wrongdoing, but that does not excuse the State's failure to elect.

Based on the foregoing, we cannot say beyond a reasonable doubt that the trial court's error in failing to require the State to elect did not contribute to appellant's conviction. *See Phillips*, 130 S.W.3d at 353-54. We sustain appellant's first issue.

### D. The State's Contentions on Rehearing

On original submission, the State's brief focused initially on its contention that "[t]he State presented evidence that appellant sexually assaulted [the complainant] . . . in multiple ways, but only presented evidence of one act of penetration." According to the State's brief, "Because evidence of multiple acts of the sexual assault alleged in the indictment were not presented, an election was not required."

The State abandons its "one act of penetration" argument on rehearing and focuses instead on contentions that (1) the error at issue is a "delay in providing the election" or a "late election at the close of all evidence" rather than a failure to elect; and (2) any error with respect to election is harmless. We address these contentions in turn.

19

### 1. "Delay in providing the election"

According to the motion for rehearing, this court's opinion "incorrectly decide[d] harm as if no election was made, rather than based on the error presented: a delay in providing the election." The State contends that it "elected a specific offense at the end of all evidence."

The State's motion for rehearing cites to the jury charge in support of its contention that it "elected a specific offense at the end of all evidence." The State also cites portions of the reporter's record containing on-the-record colloquies among the trial court and counsel that occurred (1) after the State presented its case-in-chief and rested; and (2) after the defense presented evidence and both sides then rested at the close of evidence.

The cited portion of the jury charge is the same one quoted earlier, which appears to identify only one penetrative assault occurring on or about August 16, 1987 — but simultaneously references an earlier penetration incident occurring in a bathroom. This portion of the jury charge conflates the earlier bathroom incident and the separate August 16, 1987 bedroom incident.

A review of the first cited colloquy confirms that the State made no election after presenting its case-in-chief and resting. Instead, counsel for the State and the defense discussed only *timing* of the election and debated whether the State was required to elect at the close of its case-in-chief (as the defense advocated) or at the close of all the evidence (as the State advocated). The trial court erroneously concluded at the end of the first colloquy that the election had to occur at the "[c]lose of all the evidence, including the State's case."

A review of the second cited colloquy confirms that the State made no election at the close of all the evidence when both sides rested. Instead, the State indicated

it would make an election in the jury charge and stated: "It's just going to be a matter of us figuring out how to word the description of the specific incident we are electing to go forward on. So, if we could be allowed some time to do that."

There is no meaningful distinction to be drawn on this record between a failure to elect versus a late election. The State posits a "late election" that occurred in the jury charge. But "the jury charge does not serve 'as a *de facto* election' because it is given too late in the trial to afford a defendant the requisite notice to defend." *Owings v. State*, No. PD-1184-16, 2017 WL 4973823, at *5 n.8 (Tex. Crim. App. Nov. 1, 2017) (citation omitted); *see also Phillips*, 193 S.W.3d at 912 ("A jury charge and an election are not interchangeable in this context. The State is required to elect at the close of its evidence when properly requested.").

In any event, the jury charge did not specify a single incident because it conflated the earlier bathroom penetrative assault and the later penetrative assault in the bedroom on August 16, 1987. On rehearing, the State no longer disputes that the earlier bathroom penetrative assault and the later August 16, 1987 penetrative assault in the bedroom of a different apartment are two separate incidents.

## 2. Harm

The State argues on rehearing that the second and third *Dixon* factors undergirding the election requirement "were not at issue and do not weigh in favor of harm" because "an election was ultimately made at the close of evidence and provided in the court's charge . . . ." As discussed above, the record confirms that no purported election occurred at the close of evidence and the charge itself conflates two separate incidents involving penetrative assault. With respect to the fourth *Dixon* factor, the State argues on rehearing that it does not weigh in favor of reversal because "appellant did not distinguish between the offenses, have an alibi to one

21

offense, or argue that one offense was impossible. Instead, his defense was the same across the board that no sexual assaults ever occurred . . . ."

In analyzing these contentions we draw guidance from the harm analysis in *Owings*, 2017 WL 4973823, at *6-8, which was decided after the panel issued its original opinion in this case. The Court of Criminal Appeals concluded in *Owings* that the second, third, and fourth *Dixon* factors did not point in favor of harmful error arising from the trial court's erroneous failure in that case to require the State make an election at the close of its evidence.

The indictment in *Owings* "alleged one offense describing one act of genital-to-genital contact." *Id*. at *5. But the complainant "testified that Appellant put his penis in her vagina on numerous occasions." *Id*. "Hence, she testified to more than one act of genital-to-genital contact." *Id*. "Therefore, because the defense made a timely request, we agree with the court of appeals that the trial court erred by not requiring the State to elect the act of genital-to-genital contact upon which it would rely for a conviction." *Id*.

In assessing harm under the second *Dixon* factor, the court in *Owings* stated: "All of the incidents of sexual abuse in this case were recounted by the same source . . . ." *Id*. at *6. That source was the complainant. *Id*. "This case did not involve the presentation of evidence of different activities from different sources that a jury might perceive to 'add up' to the defendant being guilty even though no individual offense was proven beyond a reasonable doubt." *Id*.

*Owings* also noted that "[t]here was very little variance in how [the complainant] . . . described the genital-to-genital contact." *Id*. "And, but for the times when [the complainant] . . . said Appellant put his penis in her vagina *and* she was also forced to perform oral sex, she described a sequence of events that happened repeatedly in the same way and under the same circumstances in the same

place." *Id*. (emphasis in original). The complainant "described repeated genital-to-genital contact that occurred in Appellant's bedroom, and the indictment alleged only genital-to-genital contact." *Id*. at *7. "Despite certain varying details, these acts of abuse could reasonably be viewed as a general pattern." *Id*.

*Owings* concluded that the second *Dixon* factor did not weigh in favor of reversal because the complainant "was either credible or she was not; she described the ongoing, repeated instances of genital-to-genital contact with enough detail to support a finding of guilt." *Id*. "Likewise, we are confident that the State's failure to elect did not result in a non-unanimous verdict." *Id*. "As noted above, the prosecution clearly focused on the same act of genital-to-genital contact that [the complainant] . . . said occurred on numerous occasions in Appellant's bedroom." *Id*. "Appellant's defense was that the sexual abuse did not occur at all." *Id*. "There is no basis anywhere in the record for the jury to believe that one incident occurred and another did not." *Id*. "Either they all did or they all did not." *Id*. "We also perceive no risk that Appellant was deprived of adequate notice of which offense to defend against." *Id*. at *8. Appellant's defense was the same as to each incident [the complainant] . . . testified to — that no sexual abuse occurred at all." *Id*.

In reaching these conclusions the court in *Owings* distinguished *Phillips*, 193 S.W.3d at 913. *Phillips* "held that the trial court's error in failing to require the State to elect was harmful constitutional error because the complainant had given more than one detailed account for each type of offense." *Owings*, 2017 WL 4973823, at *7 n.20 (citing *Phillips*, 193 S.W.3d at 907, 914). "Specifically, the purpose that was not satisfied [in *Phillips*] was the one requiring jury unanimity." *Owings*, 2017 WL 4973823, at *7 n.20. "The danger was that six jurors could convict on the basis of one of the detailed incidents and six could convict on the basis of the other detailed incident." *Id*. (citing *Phillips*, 193 S.W.3d at 13).

23

Applying this teaching, we conclude that harmful error is shown because the circumstances here are much more similar to those in *Phillips* than they are to those in *Owings* or *Dixon*. Unlike *Owings*, this case does not involve evidence of a "general pattern" of genital-to-genital contact "that happened repeatedly in the same way under the same circumstances in the same place." *See also Dixon*, 201 S.W.3d at 735 (No harm shown from failure to elect where the complainant "articulated one sequence of events and merely answered that this sequence happened one hundred times, with all but one of these instances occurring at night. The child was either credible in giving this unified account or she was not.").

In contrast to *Owings* and *Dixon*, this case involves evidence from different witnesses who described two distinct penetrative assaults that occurred under different circumstances at different times in different rooms of different apartments. Here, as in *Phillips*, there is a significant danger that "six jurors could convict on the basis of one of the detailed incidents and six could convict on the basis of the other detailed incident." *See Owings*, 2017 WL 4973823, at *7 n.20 (citing *Phillips*, 193 S.W.3d at 13). That danger is increased by the jury charge, and by closing arguments based on the charge's conflated description of a single penetrative assault as occurring both (1) "while inside a bathroom inside an apartment [complainant] . . . shared with her mother, brothers, and the defendant;" and (2) "on or about the 16th day of August, 1987" — a date that corresponds to a separate bedroom incident in another apartment.

24

## CONCLUSION

Having determined that the failure to require an election of which act the State relied upon for conviction at the close of its case-in-chief was harmful error, we reverse the trial court's judgment and remand for a new trial.[2]

/s/ William J. Boyce
   Justice

Panel consists of Justices Boyce, Jamison, and Brown.
Publish — Tex. R. App. P. 47.2(b).

---

[2] In a cross-issue, the State requests we reform the judgment. Because we remand for a new trial, we do not reach this issue.