Opinion issued August 3, 2021



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00781-CR

———————————

**DEPHNE NGUYEN WRIGHT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from Criminal District Court No. 3**
**Tarrant County, Texas**
**Trial Court Case No. 1581714R**

## MEMORANDUM OPINION

A jury convicted appellant, Dephne Nguyen Wright, of capital murder and

assessed her punishment at imprisonment for life without the possibility of parole.

In two issues, she argues that there was insufficient evidence to corroborate

accomplice-witness testimony and that the evidence was insufficient to support her conviction for capital murder.

We affirm.

## Background

The complainants in this case were Huong Ly and Long Nguyen, an elderly married couple who owned a sewing shop in Arlington, Texas, where they lived.[1] On June 10, 2012, their son-in-law, Chau Tran, called police to conduct a welfare check on them, and their bodies were found in the closet. They had been bound, beaten in the head, and had their faces taped with duct tape so that they ultimately died of suffocation. Police developed an individual named Willie Guillory as a suspect in the murders, and subsequent investigation eventually led them to Wright. She was indicted for the murders based on allegations that she and Chau Tran planned to get the complainants' life insurance payout by paying Willie Guillory's uncle, Bobby Guillory, to commit the murders.

At Wright's trial, the responding police officer testified that, when officers arrived on the scene to do a welfare check, they discovered the complainants' bodies in a closet. The complainant's hands had been duct-taped, as had their mouths and

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court from the Court of Appeals for the Second District of Texas. *See* Misc. Docket No. 19–9091 (Tex. Oct. 1, 2019); *see also* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases).

head. The apartment had been ransacked, and police found a marijuana cigarette and beer bottle wrapped in a blue bandana at the scene. Investigators found DNA on the marijuana cigarette, but they did not find a DNA match until several years later when, in 2015, Willie Guillory was arrested in an unrelated case. He provided a statement that in turn lead the police to other people involved in the murders of Huong Ly and Long Nguyen.

Detective B. Stewart testified about his investigation into the murders in Arlington. He questioned Chau Tran and other members of the family at the time of the murders in 2012. Chau Tran initially cooperated with the investigation, but he did not provide the police with any information or leads regarding who could have murdered the complainants. Detective Stewart initially did not have any suspicions that Tran may have been involved in the murders. After police traced the DNA from the scene to Willie Guillory, Willie Guillory gave a statement that led police to investigate his uncle, Bobby Guillory, also referred to at times as Bobby James Guillory. Around the time of the murders in 2012, Guillory was engaged in a relationship with a woman named Vy Nguyen, who had lived with Wright in Houston at one time. The police questioned Wright, and, after that, Chau quit cooperating.

Detective Stewart traveled to Houston to interview Wright. In a recorded conversation, Wright denied knowing anyone named Bobby Guillory, but she

3

testified that she knew a man named James who told her he was a colonel in the military and that he worked at Fort Hood. She stated that she was angry if someone named Bobby was accusing her of something, and she expressed an intention to go to Fort Hood to speak with the man she knew as James and figure out what was going on. She also acknowledged knowing Chau Tran, who she stated was a former client. She stated that she met Chau Tran in 2005 or 2006, and the last time she talked to him was when he experienced his family tragedy. He stopped being her client at that time. She testified that Chau Tran did not owe her any money currently, and she stated that she usually charges in advance. When asked, "What happens if he doesn't pay you," she responded, "I can't even tell what's going to happen. But usually, it's not going to be a nice thing to happen. I don't have to do anything to them, things just happen on its own."

After Detective Stewart received information leading to the arrest of Bobby Guillory, he was also able to obtain a warrant to search Wright's home. During that search, which was executed more than four years after the murders occurred, police found a ledger or address book with a label stating "all customers sign in" on the cover. It listed Chau Tran's name and address as a customer, and the same book included a list of names and birthdays, including those of Bobby Guillory and Vy Nguyen. The address listed for Chau Tran was for a home he had moved into four or five years after the murders. In Wright's office, Police also found copies of Bobby

4

Guillory's driver's license and concealed handgun permit, a photo collage that had multiple images of Chau Tran, and pages covered in cropped photos and symbols that included Tran's and Guillory's images and names on the same pages.[2] Police also found "a multitude" of credit cards and "cash money."

Danny Tran, the son of Chau Tran, testified that his grandparents, the complainants, had been at his house in Arlington for a birthday celebration on June 9, 2012, the night of the murders. His grandparents left after dinner. The next morning, on June 10, his other grandmother—who was Chau Tran's mother and lived in the same apartment complex as the complainants—called Chau to tell him that a window screen was out of place at the complainants' apartment. Danny stated that Chau and his other family members drove to the apartment complex to check the situation and that Chau ultimately called 9-1-1. Police searched the apartment and then informed his family that his grandparents had been murdered.

Danny Tran further testified that he recognized Wright. He had visited her house "a couple of times" with his father, Chau Tran, on trips to Houston that occurred before his grandparents' murders. He got the impression that Wright was involved in "voodoo" because there were "a lot of charms and a lot of statues" and things that he thought were "pretty weird" in her home. He knew that his father was also "superstitious" and believed in voodoo as well. Danny knew that his father was

---

[2]     A sample of the documents recovered are included in an appendix to this opinion.

5

doing business of some kind with Wright, but he did not know the nature of their business. Danny stated that the complainants owned a sewing shop and that his dad, Chau, helped them run it.

Willie Guillory, who had also been charged with capital murder of the same complainants, testified at Wright's trial.[3] He testified that, at the time of the murders, he lived with his uncle, Bobby Guillory, who was abusive toward him. They lived in the Houston area. Willie further testified that Bobby would pretend to be in the military and would wear a military uniform, even though he had never served, so that he could impress women and get discounts on meals. Willie testified that around the time the murders occurred, Bobby had had an affair with Vy Nguyen, who lived with Wright, so Willie had visited Wright's house with Bobby on multiple occasions. Willie stated that Wright was "like a mom" to him and treated him well.

On one occasion, while he was at Wright's house, Willie heard her talking on the phone to someone with a "really light" voice. Wright and this person were talking about wanting two people dead, and Wright said that "they owed her some money and that—that if [they] didn't pay up, [she] wanted them dead . . . so they can collect insurance money." Willie testified that Bobby was in the room with Wright while

---

[3]     Willie Guillory, who was 16 years old at the time these murders occurred, was certified to stand trial as an adult. He waived his Fifth Amendment right not to testify in exchange for the State's agreeing not to pursue capital murder charges against him and instead to prosecute him for first-degree aggravated robbery.

she had this phone conversation, and he had heard Bobby and Wright discuss killing people on other occasions as well. Wright told Bobby that "she wanted them to pay up or she wanted them dead." Willie further testified that he recognized Chau Tran as someone he saw one time at Wright's house, but he did not know his name or have any conversations with him.

Willie testified that he and Bobby committed the murders.[4] He stated that Wright did not want him to be involved in committing the murders—she had told Bobby that Willie was too young and "too slow" to participate—but Bobby took him anyway because he did not have anyone else to help him. He and Bobby went to the complainants' apartment twice. The second time, they entered the apartment using a key that Bobby got from Wright, who in turn had gotten it from the man with the "squeaky voice." Willie testified that no one else was there when they first entered the apartment, so they threw stuff around the apartment and searched for money, jewelry and "stuff that [Wright] wanted," including a gold chain and three Louis Vuitton purses. They "staged" the apartment with the marijuana and the bandana to make it look like a gang was involved. Willie testified that, after they waited a while, Bobby got a message on one of his phones that the people were on the way home. Willie also observed that Bobby received at least one text message from Vy Nguyen

---

[4]     The record indicated that Bobby Guillory had been tried separately for the murders and had been convicted. He was not called to testify in Wright's case.

while they were at the complainants' apartment. He described the murders in detail, stating that he and Bobby struck both complainants, then bound them with duct tape and put them in the closet. Willie stated that the woman, Huong Ly, did not seem to know what was happening, cried out when he struck her, and tried to kick him. Bobby called Wright on the way back to Houston to let her know it was done. The next morning, he and Bobby burned the clothes they had worn during the murders and then later went to Wright's house to give her the stuff they had taken from the apartment.

Chau Tran testified[5] that he first contacted Wright when he and Huong Ly (his mother-in-law and one of the complainants in the case) saw a newspaper advertisement that Wright had "some kind of magic or voodoo to help with the business." He and Ly thought Wright could help with the family's failing sewing business, which Ly owned and Tran ran. They believed that the business might have been cursed, and they paid Wright to remove the curse and give them other help. Tran testified that they paid Wright using a credit card issued to the sewing company and in cash for a few months. Business continued going down, and they sought

---

[5] The State filed a "Motion to Grant Use Immunity to Witness Chau Tran," stating that the State "hereby agrees and requests the court to order that [Chau Tran] be granted use immunity and that any evidence and testimony adduced through this witness or information derived therefrom may not be used against this witness in any adjudicatory proceeding" except for prosecution for perjury or for contempt of court. The trial court granted the motion.

additional help from Wright. Tran would take cash to her in Houston from time to time, but he eventually owed her $280,000 for the services she provided over several years. Tran testified that, when they realized they could not pay Wright, Ly was the first one to suggest that they "let her die so we can use the [insurance] money to pay" Wright.

Tran stated that he then told Wright about Ly's insurance policy, and Wright found somebody to kill Ly "so she can die and then we can get the money." Wright told him that she knew someone in the military who would do it, and he and Wright spoke "several times" about the plan. Wright told him that if he agreed to pay her "a certain amount, then [she] would . . . activate the plan for them to kill [Ly]." Tran testified that Wright was also the person who decided that both Huong Ly and Long Nguyen needed to die, because "they live together." Tran met Bobby Guillory through Wright and saw him at her house several times, but he never had any conversations with him beyond general greetings.

Chau Tran further testified that, on June 9, 2012, the day of the murders, the complainants were at his house for a birthday celebration. When they left, he telephoned Wright to let her know that they were leaving. Tran testified that he made the call using a prepaid cellphone with a SIM card that would not be traced back to him. Tran testified that he told Wright where to find the key for the apartment, and she told the killers where to find it. He knew when the complainants left the party

9

that they would die when they got home, but he did not know any of the details regarding how the murders would occur.

After the murders, Chau Tran collected the insurance money and traveled to Houston to pay Wright what he owed in cash. He testified that the bank did not allow him to withdraw the entire $280,000 at one time, so he "had to take like $50,000 here and there until we had enough" to pay what he owed Wright. He lied to police when they questioned him after the murders because he was scared of being harmed by Wright's voodoo and he believed Wright might be controlling him.

The State also presented some documentary evidence. District attorney investigator M. Brown testified about various sets of phone records, stating that the pattern of communication between Wright and both Chau Tran and Bobby Guillory tended to connect her to the parties involved at the time of the murders. He stated that he gathered phone numbers based on police interviews with various witnesses, school records, and other transactions, but the process of procuring all of the records was difficult because several years had passed. For example, Brown testified that Bobby Guillory purchased two new vehicles in the months after the murders, and Brown was able to track down the records for the phone number associated with the financing documents for that purchase. Brown provided a summary of his findings, indicating that Wright had been in regular contact with Bobby Guillory and with Chau Tran around the time of the offense. There was no direct contact between Chau

Tran and Bobby Guillory. There was likewise no contact between the complainants and Wright or between the complainants and Guillory.

Specifically, the phone records demonstrated that Wright made multiple phone contacts to Vy Nguyen and to someone in the Arlington area on June 9, 2012, the day the murders occurred. Some of the contacts between Wright and the Arlington number occurred around 5:00 pm and then around 9:00 pm, which, according to Brown, corresponded with the four-hour travel time between Guillory's home in the Houston area and the Arlington/Fort Worth area where the murders occurred. Chau Tran's phone records showed that he contacted Wright twice on the morning of June 10, 2012—the morning that the complainants' bodies were discovered—and that they had phone contact several more times throughout the day. There were also phone calls or texts between Wright and Bobby Guillory the day the bodies were discovered and over the next few days.

Brown also testified that he noticed the pattern of the calls shifted around the time of the murders. He testified that Bobby Guillory and Vy Nguyen called or texted each other numerous times per day leading up to the day before the murders. But on the day of the murders, there was no phone contact between the two on their regular numbers, and normal phone contact between the two did not resume until the evening of the day after the murders. This led him to conclude that, if they called or texted one another, they used different phone numbers to do so. The regular phone

11

contact then picked up again after the murders. There was a similarly unusual pattern of calls originating from a number that he could not identify, ending "713-261-0000," that made repeated contact with Wright through her business line only around the time of the murders. Some of the calls between the "713-261-0000" number and Wright's business line occurred at the same time Chau Tran's phone records showed that he was calling Wright on her cell.[6]

Justin Driscoll, a forensic accountant for the prosecution, testified about the financial records. The records for the sewing business's account had some modest income from clients but that business dropped off in the months leading up to the murders. Instead, the majority of the payments made from the account went toward premiums on life insurance policies. Driscoll also testified that records showed that Bobby Guillory put $500 in cash down payments to purchase two brand new vehicles. One vehicle was purchased the month after the life insurance policies paid out to Chau Tran. The other was purchased five months later, again with a cash down payment. These two purchases committed Guillory to payments for approximately $53,000 worth of vehicles. Driscoll testified, however, that the cashflow in Bobby Guillory's accounts did not support such a purchase, and Driscoll did not believe that Guillory could have saved the money for the down payments, nor could he have

---

[6]     Brown testified, "So on Chau Tran's records, it would show Chau Tran calling DMC [Wright's business number]. But oddly enough on this [record of DMC's phone call history] it's showing as a different number."

covered the monthly payments, based on what his bank records showed. Driscoll also testified that three different insurance policies made payments to Tran's wife's account over several months, totaling approximately $800,000. The records show that large amounts of money were likewise withdrawn from the account into which the insurance payments had been deposited.

The jury was given an accomplice-witness instruction with regard to two accomplice witnesses—Willie Guillory and Chau Tran—instructing that Wright could not be convicted based upon Guillory's or Tran's testimony unless the jury found the testimony true and unless their testimony "is corroborated by other evidence tending to connect [Wright] with the offense charged." The jury charge further instructed the jury to make findings on two counts alleged in the indictment: whether Wright was guilty as a party to capital murder of the two complainants in the same transaction and whether she was guilty of solicitation of capital murder. The jury found Wright guilty on both counts and assessed her punishment at imprisonment for life without parole. This appeal followed.

**Accomplice-Witness Testimony**

In her first issue, Wright argues that the State failed to present any evidence to corroborate the accomplice-witness testimony of Chau Tran and Willie Guillory. She argued that while there was some evidence connecting her to the accomplices, there was no evidence connecting her to the murders themselves.

13

## A. Standard of Review and Relevant Law

An accomplice is a person who participates with a defendant in the charged offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14.

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon* v. *State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). We view corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). If there are two views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *Smith*, 332 S.W.3d at 442. "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.*

"[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. Nor is it necessary "that the corroborating evidence directly connect the defendant to the crime[.]" *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Instead, the corroborating evidence must only link the defendant in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). The corroborating evidence need only "connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) ("The corroboration requirement in Article 38.14 does not apply separately to each element of the offense charged or to each aspect of the accomplice's testimony.").

Although a defendant's mere presence at the scene of the crime, by itself, is not sufficient to corroborate accomplice testimony, such evidence "when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Malone*, 253 S.W.3d at 257 (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). The corroborating evidence may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442. "If the combined weight of the non-accomplice evidence tends to

15

connect the defendant to the offense, the requirement of Article 38.14 has been fulfilled." *Cathey*, 992 S.W.2d at 462.

**B.   Analysis**

Wright argues that "the only evidence presented at trial was the testimony of two [accomplice] witnesses" and that the State presented no corroborating evidence tending to connect her to the offense. This misrepresents the record. Excluding the testimony of the two accomplices, we are left with the following evidence:

Police found the complainants murdered in their apartment in Arlington after receiving a call from their son-in-law, Chau Tran. There was no indication that any of the family members, including Chau Tran, had been present in the apartment at the time of the murder. However, the police recovered a marijuana cigarette from the murder scene that had Willie Guillory's DNA. According to the testimony of Detective Stewart, his investigation into Willie Guillory led police to also investigate Willie's uncle, Bobby James Guillory, both of whom lived in Houston at the time of the murders. Detective Stewart also interviewed Wright and executed a search warrant at her home in Houston. In her interview, Wright acknowledged knowing someone named James, and she also admitted that Chau Tran had been one of her customers. She testified that he had hired her for a problem with his business, which Danny Tran testified was owned by the complainants. She testified that Chau Tran did not owe her any money, but she also made threatening statements when asked

16

what would happen if someone owed her money: "I can't even tell what's going to happen. But usually, it's not going to be a nice thing to happen. I don't have to do anything to them, things just happen on its own." Wright told Detective Stewart that the last time she spoke to Chau Tran was around the time of the complainants' death, but her address book contained an address that was much more recent. Similarly, her book contained several different references to Bobby Guillory.

Danny Tran likewise confirmed that Wright and Chau Tran knew each other, were conducting some kind of business together, and that he had been in Wright's house multiple times. Danny Tran testified that he saw "a lot of charms and a lot of statues" and things that he thought were "pretty weird" in Wright's home, and he testified that his father, Chau Tran, was similarly superstitious and believed in voodoo. In Wright's office, police found unusual drawings covered in writing, symbols, and cropped photos that combined the names and images of Chau Tran and Bobby Guillory. They also found copies of Bobby Guillory's concealed handgun license and driver's license.

Finally, the State presented evidence that Chau Tran and his wife received the insurance payout on several policies, the premiums for which had been paid through the sewing business owned by the complainants and run by Chau Tran. The State also presented phone records indicating that Wright had regular communications with both Chau Tran and Bobby Guillory, but there were no connections directly

between Tran and Guillory or between the complainants and Guillory. Furthermore, the phone records demonstrated a pattern of calls between Wright and Chau and Guillory around the time the murders occurred.

Considering this non-accomplice evidence, we conclude that the State presented sufficient evidence that tends to connect Wright to the charged offense of capital murder. *See Malone*, 253 S.W.3d at 257; *see also Smith v. State*, 436 S.W.3d 353, 369–70 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The State presented evidence that Wright was the connection between Guillory—who directly committed the murders—and Chau Tran—who received the insurance proceeds following the complainants' deaths. She had drawings, pictures, and other documents linking Guillory and Chau in her office, and she was in phone contact with both of them at the time the murders occurred.

Wright argues that this evidence "did nothing more than corroborate that [she] was connected to the genuine murderers," but this disregards the nature of the evidence. She was not merely connected to either Bobby Guillory or Chau Tran; she was the person who knew both Guillory and Tran, and she was the person in regular contact with both at the time the murders occurred. *See Smith*, 436 S.W.3d at 370 (holding that sufficient corroboration was shown, in part, by appellant's presence in accomplice's company at or near place of crime). She also complains that the financial records "only show that accomplice Chau Tran acquired approximately

$850,000," but "[n]one of the records show any funds being provided to [Wright], not even a cent." We conclude, however, that the State was not required to provide corroboration of every detail or elements of the offense. *See Ambrose*, 487 S.W.3d at 598 ("The corroboration requirement in Article 38.14 does not apply separately to each element of the offense charged or to each aspect of the accomplice's testimony."); *Malone*, 253 S.W.3d at 257 (corroborating evidence need not prove defendant's guilt beyond reasonable doubt by itself); *Cathey*, 992 S.W.2d at 462 (corroborating evidence need not directly connect defendant to crime).

Wright further argues that there was no evidence that Bobby Guillory received any of the insurance money for his role in the crime because the two vehicles he purchased after the fact were financed with very small down payments. And Wright asserts that the phone records are not sufficient because it was undisputed that Guillory was having an affair with Vy Nguyen, who lived with Wright at the time, and thus the phones at Wright's residence could have been used by someone other than Wright. We are mindful, however, that if there are two views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *See Smith*, 332 S.W.3d at 442 ("[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence.").

We conclude that Wright's connection to Bobby Guillory and Chau Tran, other "suspicious circumstances" like the timing and nature of her phone contacts

with Guillory and Tran, and the direct and circumstantial evidence gathered at the murder scene and from her office, support the jury's determination that the combined weight of this evidence tended to connect her to the offense. *See Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257; *Cathey*, 992 S.W.2d at 462; *see also Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) ("Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.") (quoting *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)).

We hold that, because a rational factfinder could have concluded that the combined force of the non-accomplice evidence tended to connect Wright to the offense, the State presented sufficient evidence to corroborate the accomplice testimony. *See Malone*, 253 S.W.3d at 257.

We overrule Wright's first issue.

## Sufficiency of the Evidence

In her second issue, Wright argues that the evidence was insufficient to support her conviction for capital murder because the State failed to provide sufficient corroboration of the accomplice-witness testimony of Willie Guillory and Chau Tran. *See, e.g.*, TEX. CODE CRIM. PROC. art. 38.17; *Munoz v. State*, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993) (holding that if non-accomplice evidence does not connect appellant to offense, evidence to support conviction is insufficient resulting

in acquittal); *Snyder v. State*, 68 S.W.3d 671, 677 (Tex. App.—El Paso 2000, pet. ref'd) (holding same). Because we have concluded that the evidence supported the jury's conclusion that the non-accomplice testimony and evidence tended to connect Wright to the offense, we likewise find this argument unavailing.

To the extent that Wright argues that the evidence, including the accomplice witness testimony of Willie Guillory and Chau Tran, was insufficient to support her conviction, we disagree. We review the sufficiency of the evidence to support a conviction by considering all of the record evidence in the light most favorable to the verdict and determining whether any rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 859–60 (Tex. Crim. App. 2011). We presume that the fact-finder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). A person commits the offense of capital murder if "the person murders more than one person during the same criminal transaction." TEX. PENAL CODE § 19.03(a)(7)(A); *id.* § 19.02(b)(1) (providing that person commits offense of murder if she intentionally or knowingly causes death of individual). Wright's conviction can be upheld if there was sufficient evidence that a capital murder was committed by a principal actor other than Wright, and that Wright solicited,

21

encouraged, directed, aided, or attempted to aid that principal actor with the intent to promote or assist in the commission of the capital murder. *See id.* § 7.02(a)(2).

In addition to the non-accomplice evidence set out in our analysis above, the State presented the testimony of Willie Guillory and Chau Tran. Their testimony indicated that Wright found Guillory to commit the murders so that Tran could collect the insurance money. They both testified that she directed and aided in the commission of the murders by making plans, providing communication between Tran and Guillory, and otherwise encouraging the commission of the crime. Wright argues that the character of the accomplices discredits their testimony and undermines the sufficiency of the evidence to support her conviction. She points to Willie Guillory's other criminal history and his repeated lies during the course of the police investigation; to aspects of Chau Tran's testimony that seemed "ludicrous"; and to Bobby Guillory's actions impersonating a military officer. The issues, however, go to the weight and credibility of Willie Guillory's and Chau Tran's testimony. We defer to the jury's credibility and weight determinations because jurors are the sole judges of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Furthermore, we must presume that the jury resolved any conflicts in the evidence in favor of the verdict, and we defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

We thus conclude that the evidence was sufficient, in light of all the evidence, that the jury rationally could have found each essential element of the offense of capital murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

We overrule Wright's second issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Kelly, Landau, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).

**Appendix**



STATE'S
EXHIBIT
255
08/23/2019

24



STATE'S
EXHIBIT
257

D. WRIGHT

25