**Affirmed and Memorandum Opinion filed January 11, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00061-CR

**JULIO CASTILLO BONILLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 1582921**

## MEMORANDUM OPINION

A jury convicted appellant Julio Castillo Bonilla of the first-degree felony offense of engaging in organized criminal activity by participating in a combination to commit murder as a member of a criminal street gang. *See* Tex. Penal Code Ann. § 71.02(a)(1). In two issues, appellant argues that the evidence is insufficient to support his conviction because (1) the State did not prove that any of the bullets allegedly fired by appellant caused the death of the victim; and (2) there was insufficient evidence to corroborate the testimony of the accomplice witness.

*See* Tex. Code Crim. Proc. Ann. art. 38.14. We affirm.

## I. BACKGROUND[1]

On February 24, 2016, Noe Mendez, a documented member of the Southwest Cholo gang, was shot to death. Homicide investigators with the Houston Police Department suspected that Mendez was killed as part of an on-going gang war between the Southwest Cholos and Mara Salvatrucha 13 ("MS-13"), another gang. On April 6, 2016, the police arrested Omar Torres, Juan Flores, and Edwin Campos in connection with the murder. On April 14, 2016, the police arrested appellant. On May 23, 2016, the police arrested Elmer Amaya.

While in jail, Amaya agreed to cooperate with the police and gave a statement describing the events of Mendez's murder. Amaya's statement implicated himself and other members of MS-13, including appellant. Amaya further agreed to plead guilty and testify against appellant, Flores, Torres, and Campos in their respective trials in exchange for the State's assurance that Amaya would not receive a sentence greater than twenty years.

Appellant pleaded not guilty. Trial began on January 7, 2020.

*Trial Testimony*

Dana Hopson, an assistant medical examiner for the Harris County Institute of Forensic Sciences, provided the details of the autopsy examination of Mendez that was performed by another doctor. Hopson testified that the manner of death was homicide, caused by multiple gunshot wounds. The autopsy report and the testimony of Hopson revealed that Mendez suffered a total of twenty-seven gunshot wounds over his body: four gunshot wounds to his head, twelve to his

---

[1] Because the parties are familiar with the facts of the case and the evidence adduced at trial, we set forth the facts of the case necessary to advise the parties of the court's decision and the basic reasons for it in light of the issues raised. *See* Tex. R. App. P. 47.1, 47.4.

torso, six to his arms/elbow/wrist, and five to his legs.

Jose Duran testified that he works with the Houston Police Department as a task force officer assigned to the Federal Bureau of Investigation. According to Duran, members of the Southwest Cholos killed an individual closely associated with MS-13, which sparked a gang war. In retaliation for this murder, Melvin, Vasquez, and Flores—leaders of local cliques within the MS-13 gang—decided that their cliques would identify, hunt, and kill members of the Southwest Cholos.

Amaya testified that he joined the MS-13 when he was approximately fourteen years old and living in El Salvador. Amaya confirmed the testimony of Duran, asserting that as part of an on-going gang war, he, appellant, and other members of MS-13 would search for members of the Southwest Cholos to kill. According to Amaya, on February 24, 2016, MS-13 sent out the two local cliques led by Vasquez and Flores to find more members of the Southwest Cholos to kill. Amaya was in a vehicle with Torres, Campos, Estuar Quinones, and appellant. Campos, Quinones, and appellant were each carrying a gun: Amaya carried a .44 Special revolver; Quinones carried a .32 revolver; Campos carried a black and tan 9mm Taurus Millennium equipped with a 17-round magazine; and appellant carried a 9mm semi-automatic pistol equipped with a 9-round magazine. Torres— the driver—dropped off the four passengers when he spotted Mendez, whom Torres recognized as a member of the Southwest Cholos. According to Amaya, all four of them opened fire on Mendez, killing him as he sat in his car. After shooting Mendez, the four gunmen ran to a nearby apartment complex until Torres came to pick them up.

Donna Eudaley, one of the State's firearm experts, testified that she examined the bullets, bullet jackets, and bullet fragments that had been recovered from Mendez's body. While not all the bullets recovered were suitable for

identification, Eudaley claimed that she was able to determine that eleven bullets, one fully intact bullet jacket, and three bullet fragments were fired from four different firearms:

1) Two intact bullets and two bullet fragments were fired from the .44 Special revolver that Amaya used;

2) Three intact bullets were fired from a .32 caliber firearm—the firearm that Quinones allegedly used was a .32 revolver;

3) One intact bullet and one bullet fragment were fired from the black and tan 9mm Taurus Millennium pistol that Campos used; and

4) Four intact "fired jacketed bullets" and one intact "fired bullet jacket" were fired from a .38 caliber firearm, which includes 9mm pistols, but these were not fired from Campos's Taurus Millennium.

Christopher Sturdivant and Chris Cegielski—sergeants in the Gang Murder Squad in the Homicide Division of the Houston Police Department—testified that throughout 2015 and early 2016, they noticed similarities in multiple homicide and aggravated assault cases and began to suspect appellant and other MS-13 members were committing these crimes as part of their war against the Southwest Cholos. For several months, investigators surveilled the apartment that Campos and appellant shared. Subsequently the police arrested Campos and appellant in April 2016 and executed a search warrant for their apartment.

During the search of the apartment, the police found a black and tan 9mm Taurus Millennium semiautomatic pistol, a Sig Sauer 9mm semiautomatic pistol, extra magazines for the Sig Sauer, a box containing eighteen unfired rounds of 9mm ammunition, and MS-13-related gang drawings in Campos's closet. While searching appellant's room, they did not locate any guns, but they did find several notebooks containing what appeared to be MS-13-related drawings, poetry, and accounting ledgers.

The police also obtained search warrants for Vasquez and appellant's phones. On Vasquez's phone, they discovered several photos of appellant posing and making MS-13 gang signs with other MS-13 members, news articles related to the gang's crimes, photos of some of the murder victims, and photos of some of the firearms, such as the black and tan Taurus Millennium. Ricardo Guzman—a sergeant with the Houston Police Department that is assigned to the FBI's Multiagency Gang Task Force—testified that on appellant's phone, they found several photos of appellant making MS-13 gang signs and wearing MS-13-related clothing, photos of Campos holding an assault rifle, and voice recordings wherein appellant admitting to being a member of MS-13 and his rank within the gang.

Guzman further testified that on the day Torres, Campos, and Flores were arrested, a recording on appellant's phone indicated that appellant was "stuck where he's at because he has the guns and needs to move them." When asked why appellant would need to move guns, Guzman stated that, "Usually, when MS-13 needs to move a weapon, it's due to the gun is 'hot,' as they would refer to it, meaning it was used for some type of crime."

Guzman also testified concerning recordings taken from appellant's phone that demonstrated that appellant was assisting fellow MS-13 members to track down and hunt a Southwest Cholo member by the name of "Spooky." Guzman explained that appellant's efforts to hunt Spooky were an attempt to "put in work" for MS-13 and get promoted to the next rank. Duran later testified that promotion is directly linked to a gang member's performance of the requisite number of murders for the local clique.

The jury found appellant guilty and assessed his punishment at confinement in the Texas Department of Criminal Justice, Correctional Institutions Division, for life. The trial court sentenced appellant in accordance with the jury's verdict; on

the written judgment, the trial court entered special findings that appellant used a firearm during the offense and that the offense was gang-related. Appellant filed a timely appeal.

## II. LEGAL SUFFICIENCY

### A. Standard of Review

We apply a legal-sufficiency standard of review in determining whether the evidence supports each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see also Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Criff v. State*, 438 S.W.3d 134, 136–37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). We consider all evidence in the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "The Due Process Clause to the United States Constitution requires that a criminal conviction be supported by a rational trier of fact's findings that the accused is guilty of every essential element of a crime beyond a reasonable doubt." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We will uphold the jury's verdict unless a rational factfinder must have had reasonable doubt as to any essential element. *Id.* at 518; *West v. State*, 406 S.W.3d 748, 756 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

We do not, however, re-evaluate the weight and credibility of the evidence

or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the witness's credibility and the weight given their testimony, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Isassi v. State*, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010) ("As long as the jury's finding of a culpable intent 'is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable.'"); *Bargas v. State*, 252 S.W.3d 876, 887 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The jury may choose to believe or disbelieve any portion of the witnesses' testimony.").

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge and as authorized in the indictment. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge is one that 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). "The 'law as authorized by the indictment' includes the statutory elements of the offense and those elements as modified by the indictment." *Id.* (quoting *Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013)). Our use of the hypothetically correct jury charge ensures a judgment of acquittal is reserved for cases in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge. *McCombs v. State*, 562 S.W.3d 748, 759 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Malik*, 953 S.W.2d at 240).

In this case, such a charge would state that appellant committed the offense of engaging in organized criminal activity by committing the murder of Mendez as a member of MS-13 by shooting him with a firearm if appellant caused Mendez's

death either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and appellant's conduct was clearly insufficient. *See* Tex. Penal Code Ann. § 6.04(a), 71.02(a)(1).

**B.  CONCURRENT CAUSATION**

In his first issue, appellant argues that the evidence is insufficient to support his conviction because the jury could not have found all of the essential elements beyond a reasonable doubt, averring that the State failed to prove that at least one of appellant's gunshots actually caused Mendez's death.

**1.  Applicable Law**

The existence or nonexistence of a causal connection is a question for the jury's determination. *See Dorsche v. State,* 514 S.W.2d 755, 757 (Tex. Crim. App. 1974); *Fountain v. State*, 401 S.W.3d 344, 358–59 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). "The State is not required to prove beyond a reasonable doubt that the act alleged in the indictment *alone* caused the death." *More v. State,* 692 S.W.2d 912, 920 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd) (citing *Jones v. State,* 644 S.W.2d 530, 532 (Tex. App.—Corpus Christi–Edinburg, 1982, no pet.)) (emphasis in original). It is an established rule in homicides that if the act of the defendant alleged in the indictment contributed to the death of the deceased, he is responsible, though other contributing causes existed. *Id.* (citing *Jones,* 644 S.W.2d at 531–32, and *Wright v. State,* 388 S.W.2d 703, 706 (Tex. Crim. App. 1965)).

In the section "Causation: Conduct and Results," the Texas Penal Code provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the

conduct of the actor clearly insufficient." Tex. Penal Code Ann. § 6.04(a); *Robbins v. State,* 717 S.W.2d 348, 351 (Tex. Crim. App. 1986) (op. on reh'g). "If concurrent causes are present, two possible conditions exist to satisfy the 'but for' requirement: (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause; or (2) the defendant's conduct and the other cause *together* may be sufficient to have caused the harm." *Robbins,* 717 S.W.2d at 351. A defendant cannot be convicted if the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's conduct, by itself, is clearly insufficient. *Id.*

## 2. Application

Appellant admits that the charge properly instructed the jury on the offense as listed in the indictment. However, appellant contends that the jury charge did not authorize a conviction based on criminal responsibility for the conduct of another. *See* Tex. Penal Code. Ann. § 7.01, 7.02. And according to appellant, while the evidence indicated that four individuals shot and killed Mendez, there was no evidence that any of the bullets fired by appellant were the cause of Mendez's death. Thus, he asserts there is insufficient evidence to prove that appellant caused the death of Mendez. The State argues that the absence of a party-liability instruction is immaterial because appellant's complaint relates to causation and a hypothetically correct jury charge would have included instructions on concurrent causation. Thus, the State argues that there is sufficient evidence to establish that Mendez either caused Mendez's death alone or concurrently with another cause. We agree.

Here, the State presented evidence that on February 24, 2016, appellant, along with other members of the MS-13 gang, were searching for members of the Southwest Cholos gang to kill as part of an on-going gang war. Appellant and three

other MS-13 members found Mendez, approached him in his vehicle, and shot him to death. According to Amaya, all four of the MS-13 members, including appellant, fired at Mendez.

Hopson did not specifically testify which of the twenty-seven bullets was fatal. Instead, Hopson testified that Mendez's cause of death was multiple gunshot wounds. According to Hopson, many of the gunshot wounds inflicted serious bodily injuries upon Mendez. The jury, as sole factfinder, was free to believe and draw reasonable inferences from this evidence. *See Jackson,* 443 U.S. at 319. The jury could reasonably infer from the evidence that the four intact "fired jacketed bullets" and one intact "fired bullet jacket" recovered from Mendez's body were fired by appellant because they did not match any of the other guns recovered from the scene and matched the description that Amaya gave of the gun used by appellant. From this, the jury could reasonably believe that appellant caused at least five of Mendez's twenty-seven gunshot wounds.

The autopsy report indicated that the only "fired bullet jacket" was extracted from Mendez's right wrist. As to the four fired jacketed bullets attributable to appellant, the autopsy report indicates that they could have been recovered from twelve possible gunshot wounds. The autopsy report and Hopson's testimony established that none of these twelve wounds were "graze wounds," which Hopson described as superficial. Rather, all twelve of these wound sites caused serious injury to Mendez's brain and other vital organs. Appellant could not be convicted "[i]f the additional cause[s], other than the [appellant's] conduct, [are] clearly sufficient, by [themselves], to produce the result *and* the [appellant's] conduct, by itself, is clearly insufficient." *Robbins,* 717 S.W.2d at 351. Thus, while there was some evidence that the gunshot wounds from Quinones, Campos, and Amaya were clearly sufficient by themselves to cause Mendez's death, there was no evidence

10

that appellant's conduct alone was clearly insufficient by itself to cause Mendez's death. *Id.*

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that appellant's shooting of Mendez was not "clearly insufficient" by itself as to absolve appellant of criminal responsibility under § 6.04(a). *See* Tex. Penal Code Ann. § 6.04(a); *Robbins,* 717 S.W.2d at 351. Thus, the evidence meets § 6.04 and is legally sufficient—a rational jury could have found, beyond a reasonable doubt, that appellant's shooting of Mendez was a but-for cause of Mendez's death. Therefore, we overrule appellant's first issue.

## C. CORROBORATING EVIDENCE

In his second issue, appellant argues that there is insufficient evidence to corroborate Amaya's accomplice testimony.

### 1. Applicable Law

Texas Code of Criminal Procedure article 38.14—entitled "Testimony of Accomplice" and commonly known as the accomplice-witness rule—provides that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed. *See* Tex. Code Crim. Proc. Ann. art. 38.14. The accomplice-witness rule expressly provides that "the corroboration is not sufficient if it merely shows the commission of the offense." *Id.*

The accomplice-witness rule is a statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards. *Malone v. State,* 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Cerna v. State*, 441 S.W.3d 860, 864–65 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). When evaluating the sufficiency of corroboration evidence

11

under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Malone,* 253 S.W.3d at 257. To meet the requirements of this rule, the corroborating evidence by itself need not prove the defendant's guilt beyond a reasonable doubt. *Id.* Rather, the evidence simply must link the defendant in some way to the commission of the offense and show that rational jurors could conclude that this evidence sufficiently tends to connect the defendant to the offense. *Id.* Thus, when there are two permissible views of the evidence, one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense, appellate courts should defer to the view of the evidence chosen by the fact-finder. *Simmons v. State,* 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). The issue is not how an appellate court independently would assess the non-accomplice evidence but whether a rational fact-finder could conclude that the non-accomplice evidence tends to connect the accused to the offense. *See id.* at 509.

Each case must be judged on its own facts, and there is no set amount of non-accomplice corroboration evidence that is required. *Malone,* 253 S.W.3d at 257. The Court of Criminal Appeals has observed that circumstances that are seemingly insignificant may constitute sufficient evidence of corroboration. *Id.* Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Id.* But the presence of a defendant at the scene of a crime, by itself, is insufficient to corroborate accomplice testimony. *Id.*

## 2.    Application

Appellant does not dispute that Amaya was an accomplice witness. *See Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013) (concluding that a witness is an accomplice as a matter of law when the witness is charged with the same offense as the defendant, or a lesser-included offense, or "when the evidence clearly shows that the witness could have been so charged"). Aside from Amaya's accomplice testimony, evidence at trial included the following:

- Voice recordings and photographs from appellant's phone—in addition to items in his room, including ledgers, diaries, poems, and drawings—indicating that he was affiliated with and actively engaged with MS-13.

- Guzman testified that appellant was assisting fellow MS-13 members to track down and hunt "Spooky," a Southwest Cholo member, as part of an on-going gang war. Guzman explained that appellant's efforts to hunt Spooky were an attempt to get promoted to the next rank by performing in the requisite number of murders for the gang.

- Eudaley testified that the bullets recovered from Mendez's body were fired from four separate firearms: a .44 Special revolver, a .32-caliber gun, and two different 9mm guns, one of which was a black and tan Taurus Millennium that was found in Campos's closet. Testimony established that of the twenty-two 9mm shell casings recovered from the crime scene, only fifteen were fired from the Taurus Millennium. Appellant admitted at trial that the empty box for a 9mm firearm that was found in his closet corresponded with the black and tan Taurus Millennium found in Campos's closet. *See Cockrum v. State*, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988); *Smith v. State*, 436 S.W.3d 353, 370 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

13

- A surveillance video shows the four gunmen walking towards Mendez before the murder. Amaya testified that the four walked in pairs: Campos walked next to appellant in front while Amaya walked next to his friend Quinones in the back. Although appellant cannot be positively identified from the footage, it appears that the two individuals in front differ in physical stature. One is tall and skinny whereas the other is short and stocky. Appellant admitted at trial that Campos is short and stocky compared to appellant, and that he is relatively tall and skinny.

- According to gang experts, Mendez was documented as a member of the Southwest Cholos gang.

- In a voice recording after Torres, Campos, and Flores were arrested, appellant stated that he was, "stuck where he's at because he has the guns and needs to move them." *See Cockrum*, 758 S.W.2d at 582 (concluding that evidence that connected the defendant to a weapon similar to one used in the offense may sufficiently corroborate accomplice testimony); *Smith*, 436 S.W.3d at 370 ("Proof that connects an accused to a weapon used in an offense is proper corroborative evidence.").

In summary, there was evidence that: connected appellant to weapons confirmed as being related to the murder; identified appellant as a member of the MS-13 gang, which was killing members of the Southwest Cholos as part of a gang war; identified that Mendez was a member of the Southwest Cholos gang; and showed an individual matching appellant's physical stature at the scene of the crime.

Viewing all of the foregoing evidence in the light most favorable to the jury's verdict, we conclude that a reasonable jury could have found that the non-accomplice evidence tends to connect appellant to the murder. *See Malone,* 253

S.W.3d at 257; *Smith*, 436 S.W.3d at 370. We overrule appellant's second issue.

## III.  CONCLUSION

We affirm the trial court's judgment.

/s/     Margaret "Meg" Poissant
Justice

Panel Consists of Justices Jewell, Poissant, and Wilson.
Do Not Publish — Tex. R. App. P. 47.2(b).

15